# SABARIEGO *v.* MAVERICK.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

Argued November 11, 14, 1887.— Decided January 23, 1888.

When a government officer, acting under authority of law and in accordance with its forms, conveys to an individual a tract of land as land of the government, the deed will pass only such title as the government has therein; and there is no presumption of law that it is a valid title.

Under the provisions of Spanish law in force in Mexico in 1814–1817, confiscation of property as a punishment for the crime of treason could only be effected by regular judicial proceedings; and, it being once declared, the property remained subject to the exclusive jurisdiction of the intendants, both in ordering sale and in taking cognizance of controversies raised concerning it.

There is no legal presumption in favor of jurisdiction in proceedings not according to the common course of justice; but the policy of the law requires the facts conferring it to be proved by direct evidence of a formal character.

The facts that Spanish public officers seized a tract of land in Mexico as confiscated for the treason of its owner, and that after taking regular and appropriate steps for its sale they proceeded to sell it and to make conveyance of it by instruments reciting these facts and accompanied by certificates of the officers who took part in the transaction that the property had been so confiscated, raise no presumption, under the law of any civilized State, that any judicial proceedings were taken against the owner to find him guilty of treason, or to confiscate his property for that offence.

To entitle a plaintiff to recover lands by virtue of prior possession, in an action brought against an intruder, a wrongdoer, or a person subsequently entering without right, it must appear that the possession was in the first instance under color of right, and that it has been continuous and without abandonment; or, if lost, that there was an *animus revertendi.*

TRESPASS to try title. The following is the case, as stated by the court.

This is an action of trespass to try title, brought in the Circuit Court of the United States for the Western District of Texas by Pilar Garcia de Sabariego and her husband Manuel, citizens of Mexico, against Maverick and others, citizens of Texas, to recover a certain tract of land lying in the city of San Antonio, Texas. She claimed the property as the sole

heir of her deceased father, Francisco Garcia, and of her deceased mother, Gertrudes Barrera de Garcia, both of whom it was alleged died seized and possessed of the said land. The different defendants filed pleas of not guilty, the statute of limitations, alienage of the plaintiffs, &c. On the trial, as shown by the bill of exceptions, the plaintiffs read in evidence certain partition proceedings, showing title in one Miguel Losoya to the suerte or tract claimed in the suit by a grant from the King of Spain. The plaintiffs next offered in evidence certain documents, the originals being in Spanish, and translations of which into English are set out, and a deed from a board of commissioners to Garcia, showing a sale and conveyance of the premises in controversy to him, based, according to the recitals, upon a confiscation of the property of Losoya by the Spanish government in the year 1814. These documents, relating to the confiscation, sale, and conveyance of the property in controversy, were admitted in evidence, the court stating at the time that, in its opinion, they did not show any decree or adjudication of confiscation sufficient to warrant the sale, and that, unless the plaintiffs could show some further proceedings upon which to base the action of the officers in the premises, the said proceedings constituted no legal confiscation and passed no title to the purchaser at said sale. Counsel for the plaintiffs then stated to the court that they were unable to offer in evidence any further or other confiscation decree or proceedings than those already offered and read in evidence. Counsel for the plaintiffs then offered other testimony in depositions, "but the court, upon the objection of defendants, refused to allow the depositions aforesaid, or any part of them, to be read, and refused to permit plaintiffs to make any of the proofs aforesaid upon the ground that the said confiscation proceedings were insufficient to pass title of any character, and that no title of any character was thereby passed to or vested in said Garcia, and that this was fatal to plaintiffs' right of recovery, and that all the said evidence read as well as that proposed to be offered showed no title in plaintiffs which would warrant a verdict and judgment in their favor."

The court thereupon directed a verdict for the defendants, which was rendered, and judgment thereon accordingly, to reverse which this writ of error is prosecuted.

The document relating to the sale and conveyance of the premises in dispute are as follows:

The first is entitled: "The governor of the province of Texas returns statements of property confiscated from the rebels in Bexar, and of the condition thereof, and asks whether some of it may be sold." Then follows a list of the names of the parties and a general description of the property of each, extended into a column of valuations. In this list appears the name of Miguel Losoya; the property described, one-half dula of water; extended 100. This list is preceded by the following heading: "Statement of property confiscated from the rebels of this city by the order of the commanding general, Don Joaquin de Arredondo, as shown by the statement and inventory made by Captain Don Fran'co del Prado y Arce on the 27th of October, 1814, which I copy, and to which I refer myself, viz." It is dated Bexar, the 27th of October, 1814, and signed F'co del Prado y Arce, Juan Fran'co de Collantes. Then follows: "General inventory and copy of property belonging to the king, and confiscated from the insurgents of this province, which I received from my predecessor, Lieutenant Don Juan Antonio Padilla, and is now in existence, viz." In this list also appears Miguel Losoya's one-half dula of water. Then follows, under the head of remarks, the following:

"All the other confiscated property appearing in the statement made by Don Francisco del Prado as above, in the copy of the statement of existing property which I have received from my predecessor, Lieutenant Don Antonio Padilla, now wanting, shall be accounted for by my predecessor in office, since I have had no knowledge of it; but I will be accountable for the property which I received from said Padilla, as appears in this last statement.

"Bexar, 19th of September, 1817.

"JUAN FRAN'CO DE COLLANTES."

On the same document is the following endorsement:

" [On margin:] On the 20th inst. receipt was acknowledged, stating that he shall be advised of the result.

" There are in this city several houses sequestered from the insurgents who took part in the revolution of this province, which took place in the past year, 1811, but all of them are so deteriorated that they are becoming wholly unserviceable, having never been repaired, owing to want of funds for that purpose, a few of them having been inhabited by persons connected with the army, who, considering their well-known straitened circumstances, had means to pay rent only. The result is that, although at that time they were appraised by commissioners appointed for that purpose, according to their inventory existing in these archives, in amounts which were then adequate, they cannot now be worth one-half of what they were then, and some of them may not be worth one-third; and, considering that their ruinous condition increases from day to day, I hope that your lordship will please tell me whether some of them may be sold in case that purchasers be found, and whether, owing to the cause above specified, some rebate may be made on the appraised value, considering that at this moment a buyer comes before me of a house appraised at three hundred and eighty dollars, but, inasmuch as the price does not suit him; he asks for some rebate on it, said house being wholly unserviceable. In these terms, and considering that this business is under the authority of the intendancy, I shall act according to the instructions which your lordship may give on the subject. God keep you many years.

" Bexar, September 14, 1817.

" ANTONIO MARTINEZ.

" To the Intendant of San Luis Potosi.

" One 'cuartillo.'

"Fourth stamp: 'One cuartillo.' For the years eighteen hundred and fourteen and fifteen.

" San Luis Potosi, the 20th of October, 1817.

" Let the official communication of the governor of the province of Texas, and inventory and statements thereto

attached, upon houses sequestered from the rebels at [SEAL.] Bexar, and asking whether some of them may be sold, be filed, and let the whole be referred to the 'asesor' for his opinion upon such instructions as may be proper. The intendant 'corregidor' of this province, Don Manuel Jacinto de Acevedo, has thus decreed and ordered and did sign hereto with assisting witnesses, in default of a notary, which I certify.

"[SEAL. 1817.]        MANUEL DE ACEVEDO.

"Assisting, JOSÉ MARIA BURAL.

MAN. JOSÉ DOMINGO.

"One cuartillo.

"[On margin:] Erasures are not valid.

"To the Intendant.

"Article 82 of the royal ordinance of December 4, 1786, gives power, in case of confiscation by sentence of any property within the territory of this province, and makes it the special duty of your lordship to proceed to the alienation and collection of the proceeds and to take cognizance of all litigation and claims subsequently arising; and on the same subject a superior order was afterwards issued referring to property confiscated from the rebels. In these terms and in the case to which the governor of the province of Texas makes reference at the beginning of his report of the 19th of September of this year, that the confiscation of the property mentioned in it was effected by the order of the commanding general of the eastern provinces, the provisions of said articles are applicable, and, consequently, your lordship should be pleased to order that the confiscated property, owing to the deterioration it has suffered, as stated, be reappraised by two sworn experts, thus altering the value heretofore assessed on it in order to facilitate its more speedy sale and that its total loss may not result to the prejudice of the royal treasury, and said property being thus appraised let it at once be offered in public sale for the term of nine days, three outcries being afterwards made, and, at the last outcry, adjudication being awarded to the best bidders for parcels, who may appear with the respective bond

certificates by persons able to give security for their bids, and these bids shall be good and may be accepted for adjudication thereon, provided that others be not made a little more in excess of the two-third parts of the amount of appraisement, this being the practice generally observed in all the tribunals. And your lordship will please give notice of this decision to the commanding general; whereupon these proceedings should be referred for the specific objects to the governor of Bexar, who should in due time report the results to this intendancy.

" San Luis Potosi, October 29, 1817.

"(Lic'do)                    JOSEF RUIZ DE AGUIRRE.

"San Luis Potosi, October 31, 1817.

" As the 'asesor' advises, let this be communicated to the commanding general of the eastern provinces for his information. This his lordship has decreed and signed hereto, which he certifies.

" ACEVEDO.

" Assisting, JUAN JOSÉ DOMINGO, 3.
JOSÉ MARIA BURAL.

" On the same day an official communication was addressed to the general commanding the eastern provinces, with insertion of the foregoing opinion, which I certify.

"—— ——, Paraph."

Then follows a " statement showing the property sequestered from the rebels of the capital of Texas, according to the inventory existing in the archives of this government, specifying that which has subsequently been returned, donated, and finally ruined by the swollen river in the overflow of the 5th of July of this year, viz." This includes Miguel Losoya, one-half dula of water, rented for one fanega of corn; dated at Bexar, September 10, 1819.

The next document referred to is called a " translation of confiscation proceedings of 1819," dated at the Intendancy of San Luis Potosi, in the year 1819: " The governor of Texas reports the injury caused by the overflow undergone by the city of Bexar on the fifth of July to the landed estate confis-

cated from the insurgents. Statement of the houses and ' jocales ' (thatched cabins) belonging to the royal domain, as confiscated from the rebels, which have been ruined in the overflow of the city of Bexar, which took place in the morning of the 5th of July." Then follows a list of houses and "jocales," dated Bexar, the 8th of July, 1819, signed José Flores; Examined, Martinez; with the following statement at its conclusion:

" On the morning of the 5th instant, in consequence of a terrific water-spout which burst north of this city, the river became so swollen as to run over its banks, causing a general overflow such as has never been beheld in the province before, leaving the city in such a condition that it may be said to exist no longer, and its inhabitants (those who were not victims of the fury of the waters) being reduced to the most lamentable destitution. The landed estate belonging to the royal domain by sequestration has been ruined by that overflow, a statement of which property I enclose herewith for the knowledge of your lordship. The unfortunate condition of this people did not allow me to offer that property for sale, as your lordship had instructed; now and for better cause it will be more difficult, and all the houses left standing will by degrees fall in ruins, as they have been considerably shattered by the overflow; even the parcels of cultivable land are no longer fit for cultivation. Therefore your lordship will please determine as you may deem most advisable, in order that the royal domain may not suffer a total loss. May God preserve you many years.

" Bexar, July 9, 1819. Antonio Martinez.

" To the intendant, Don Manuel Acevedo.

" One ' quartillo ' fourth [L. s.] stamp, one quartillo, years eighteen hundred and sixteen and eighteen hundred and seventeen. One ' quartillo.'

" September 13th, 1819.

" [L. s.] Luis Potosi.

" Let the governor of the province of Texas be notified that this intendancy is informed of the occurrence referred to in

the foregoing letter, and that, inasmuch as the property mentioned in the accompanying list has suffered so great injury, while other property is completely falling into ruin, he will cause the same to be appraised again by experts sworn in due form, and that it be sold at auction, to be awarded to the best bidder, conforming himself, so far as the said occurrence allows, to the order given on the subject and contained in the proceedings addressed to him on the thirty-first of October, eighteen hundred and seventeen. Thus it has been determined and signed by the 'Señor Intendente Corregidor' of this province, by the advice of his 'Intendente Letrado,' before me, which I certify.

> "MANUEL DE ACEVEDO,
> *Licenciado, Josef Ruiz de Aguirre.*

"Before me —               ANTONIO MARIA JUARES,
      "*Notary Royal and Military Intendente of State.*

"On the seventeenth of the same month the letter was dispatched as by orders.

> "JUARES."

This list of houses and "jocales" does not contain any reference to Miguel Losoya, but in the same document follows a "statement of property this day in existence confiscated from the rebels of the capital of Texas, viz." In that list is found the name of "Miguel Losoya, one-half stock watering privilege (*media dula de agua*), with its land;" dated Bexar, September 10th, 1819; signed José Flores and Martinez.

Then follows an "exhibit of the property sequestered from the rebels of the capital of Texas according to the inventory existing in the archives of this government, stating what was subsequently restored, donated, and received, and finally swept off by the waters of the river in the overflow of the 5th of July of this year, viz." In this again appears "Miguel Losoya, one-half stock watering privilege, with land, rented for one fanega of corn;" dated Bexar, September 10, 1819; signed José Flores; Examined, Martinez. And there is added the following statement:

" Considering that the. overflow of the 5th of July last past resulted in the ruin of several houses and all the . 'jocales' which were sequestered and belong to the royal domain, I instructed the agent of said property to make statements, which I enclose herewith to your lordship for your information. One of these statements exhibits all the sequestered property, as. I did formerly report to your lordship, stating the disposition made of that property. The other statement shows what is this day remaining of said 'property, with the remark that in relation to the arable lands most of it has been destroyed by the overflow, being situated in close proximity to the banks of the river, and they are no longer fit for cultivation. I also enclose to your lordship a statement, as required, of the same commissioner, who has not one 'real' on hand, but holds some bills, part of which may be collected, being against the troops, to which they may be charged on their accounts; others, however, will be of difficult collection, being due by several parties whom the late misfortune has left in the greatest destitution, and now exclusively depending on the charity of his excellency, the viceroy, who has sent $29.00 for the purpose, and of the most illustrious prelate, Don José Ignacio de Aransivia, who contributed $19.00. However, your lordship will determine as you deem just. May God preserve your lordship many years.

" Bexar, September, 1819.

" ANTONIO MARTINEZ.

" To the Intendent, Don Manuel. de Acevedo.

" Luis Potosi, October 20th, 1819.

" Let this letter and accompanying documents be filed with the former proceedings existing in this intendancy, and be referred to the 'promotor fiscal,' and according to his request to the 'asesor.'

" [L. s.]                                              ACEVEDO.

" Antonio Maria Guares, one 'quartillo'; fourth stamp, one quartillo; years eighteen hundred and sixteen and eighteen hundred and seventeen, one quartillo.

" [L. s.]     [L. s.]   One quartillo."

Also the following:

"Proceedings of Sale of the Property Sequestered from the Rebels for the Account of the Royal Revenues. Year 1819.

"The real estate sequestered in this capital from the rebels, having to be sold for the benefit of the royal treasury, in order that said royal treasury may not lose all its interests owing to the great depreciation suffered by said property, and by virtue of the orders received by me on the subject, I commission you jointly with the inhabitants, Don Vicenti Gortori, first regidor, and Don José Flores, agent of said property, to proceed to said sale, in accordance with the opinion of the 'asesor' of the intendancy of San Luis Potosi, a copy of which I enclose to you in order that you may conform with it in all its points, and to form the heading of the proceedings to be instituted on the subject. I do likewise enclose a statement of the houses and lands which must be sold according to the last appraisement made by the experts, José Donaciano Ruiz and Francisco Zapata, master masons, for the houses, and for the lands by the farmers Francisco Flores, Don Santiago Seguin, Diago Perez, and José Gomez, to whom I did administer the oath to proceed to the appraisement; and you will inform me of the result, and forward said proceedings to me. May God preserve you many years.

"Bexar, 6th of November, 1819.

"ANTONIO MARTINEZ.

"To Captain Don Manuel Cedran.


"Potosi, the 20th of October, 1817.

"Let the letter of the governor of the province of Texas and the accompanying inventory and statement of houses sequestered from the rebels of Bexar be filed, advising whether any of them may be sold, and let the whole be referred for advice to the 'asesor' for such determination as he deems proper. The 'intendante corregidor' of this province, Don Manuel Jacinto de Acevedo, has thus determined and ordered and

signed hereto, with assisting witnesses, in default of a notary, which I certify.

"MANUEL DE ACEVEDO.

"Assisting, JUAN JOSÉ DOMINGUEZ.

JOSÉ MARIA LOMA.

"To the Intendant.

"Article 82 of the royal ordinance of December 4, 1786, gives power in case that in the territory of this province the case should arise to confiscate any property, it should be the special duty of your lordship to proceed to the alienation and to the collection of the proceeds, notwithstanding all pleadings and applications subsequently made. On this same subject orders were subsequently issued referring to property confiscated from the rebels. Consequently, and whereas the governor of the province of Texas states at the beginning of the statement made on the 19th of September of this year that the confiscation from the inhabitants referred to in it was made by the order of the commanding general of the eastern provinces, the case referred to in said article exists, and therefore your lordship should order that the confiscated property, owing to the depreciation suffered by it, shall be appraised again by two sworn experts, thus modifying the prices formerly assessed, in order to facilitate a prompt sale, and to avoid a total loss to the injury of the royal treasury; and that said property, upon being thus appraised, be placed at auction for nine days, and afterwards cried three times, and at the last cry be adjudicated to the best bidder or bidders for parts, who may appear with proper security papers by individuals able to be good for their bids, and said securities shall be good and may be accepted in proceeding to the adjudication, provided that other parties do not offer a little more than two-thirds of the appraisement, this being the practice habitually observed by all courts; and your lordship should inform the commanding general of this determination, and subsequently refer these proceedings for the contemplated purpose to the said governor of Bexar, who will in due time report the results to the intendancy.

"San Luis Potosi, October 29, 1817.

"LICENCIADO, JOSÉ RUIZ DE AGUIRRE.

"San Luis Potosi, October 31, 1817.

" Agreeably to the advice of the 'asesor,' this will be communicated to the commanding general of the eastern provinces for his information.

" Thus his lordship has decreed and did sign hereto, which I certify.

" ACEVEDO.

" Assisting, JUAN JOSÉ DOMINGUEZ.

JOSÉ MARIA LOMA.

" I, Don Antonio Martinez, Knight of the Royal Order San Hermenegildo, colonel in the royal armies, and civil and military governor for his Majesty of this province of the Texas, New Philippines, &c., do certify that the foregoing opinion is a literal copy of that appearing in the proceedings referred from the intendancy of San Luis Potosi and existing in the archives of government in my charge, and for due authenticity I have signed hereunto at Bexar, the 6th of November, 1819.

" ANTONIO MARTINEZ."

To this is attached : " Exhibit of property sequestered from the rebels to be offered at public auction, with statement of the value of the same according to the last appraisement." In this list is contained Miguel Losoya's suerte, and extended in a column of figures at 50. This list is dated Bexar, the 6th of November, 1819, and signed Antonio Martinez.

Then follows a return by the commissioners of the sale, as follows :

" Pursuant to your lordship's order to proceed to the sale and adjudication of the property sequestered from the rebels of this province, the same was placed at auction for the term of nine days, after which it was cried three times, as prescribed by the order of the intendant of San Luis Potosi, said property and grounds being adjudicated at the last cry, as appears from the documents which we return to your lordship, with others referred by you to this board, for your information, with the

understanding that the buyers have been notified to keep the amounts in which the adjudication was made subject to your lordship's pleasure. The other property has not been adjudicated, because no bidders presented themselves.

"May God preserve your lordship many years.

"Bexar, November 22, 1819.       "MANUEL CEDRAN.

                               "VICENTE GORTORI.

                               "JOSÉ FLORES.

"To Governor Don Antonio Martinez.

"In the city of San Fernando de Bexar, on the twenty-second day of the month of November, in the year eighteen hundred and nineteen, we, the board of commissioners organized for the sale of the property sequestered from the rebels of this province by the order of the governor of the same, Colonel Don Antonio Martinez, viz., Captain Don Manuel Cedran, Don Vicente Gortori, first regidor of the ayuntamiento of this capital, and the inhabitant Don Josef Flores de Abrego, by virtue of the order of the said governor heading these proceedings, in consequence of the order received by that chief from the intendancy of San Luis Potosi, also herein inserted, to proceed to the sale of said property sequestered, as appears in the exhibit accompanying the order of said governor, the whole for the benefit of the royal treasury, do certify and, so far as we are able, do pledge our faith that, after having placed said sequestered property mentioned in the above recited order and exhibit at auction for the term of nine days, and caused the same to be cried three times, according to the order of the intendant of San Luis Potosi, they were adjudicated at the last cry, which took place on the twenty-first instant."

Then follows a list of the property sold, including "that of Miguel Losoya, also in favor of Captain Don Francisco Garcia, in fifty-five dollars." The return proceeds:

"To which parties adjudication was made, being the only ones whose respective bids reached the limits specified, no other party having bidden over them, nor did buyers present

themselves for the other property contained in the governor's statement; and for due authenticity, wherever it may be proper, we give the presents, signed by us on the aforesaid day, month, and year.          "MANUEL CEDRAN,

"VICENTE GORTORI,

"JOSÉ FLORES,

"*Presidial Company of Bexar.*

"Received from the board commissioned by the governor of the province, Colonel Don Antonio Martinez, the sum of three thousand one hundred and fifty-five dollars, proceeds of the sale of rebel property in favor of the royal treasury, which shall be charged to this company, of which I am the fiscal agent, and used for the support of the troops in said province.

"Bexar, November 27th, 1819.

"$3155.00.          ALEXANDRO TRAVIÑO.

"Examined : MARTINEZ.

"The property sequestered from the rebels in this capital having been offered for sale by virtue of your lordship's order to me on the subject, I enclose to you the proceedings formed concerning said sale, together with the receipt of the sum of three thousand one hundred and fifty-five dollars, proceeds of the sale of said property, which amount was received by the financial agent of this presidial company for the support of the troops of this province, which had no means whatever. Therefore I hope that, should your lordship deem it proper, the royal treasury department at Saltillo will be instructed to charge the same against the said Bexar Company.

"As to the property still remaining unsold, no bidder having presented himself, owing both to the depreciated condition of the same, and to the poverty of the population, which does not permit them to buy it; some purchasers might present themselves if it were sold on credit, which point I did not wish to determine, because, although some honorable persons may be found able to assume that indebtedness, the uncertainty of the crops and their reduced proportion might prevent them from meeting it. However, your lordship will determine as you deem advisable.

"Respecting the house sequestered from the rebel, Vicente Travieso, (which has been provisionally transferred to the ayuntamiento of this city by your lordship's order,) no bidder will ever appear, because it has been materially injured by the overflow, and it would be impossible for the whole population to raise the four thousand five hundred dollars, amount of its reduced appraisement. May God preserve your lordship many years.

"Bexar, December 10th, 1819. ANTONIO MARTINEZ.

"To the intendant, Don Manuel de Acevedo.

"Potosi, January 20th, 1820.

"To the 'promotor fiscal,' in whose office the former proceedings exist, Licenciado, Ruiz de Aguerre: I return these proceedings, after having taken proper action thereon and on the former proceedings, without the respective requests, in order that the 'juez de letras' of the respective district may act as he deems just.

"Potosi, April 16th, 1821.

"LICENCIADO, MARQUEZ."

The next document is the deed of the commissoners, as follows:

"*Translation of Deed. Nov.* 23, 1819.

"Valid during the reign of our Lord Ferdinand 7th.

4th stamp, 1819.

"The party interested paid in this revenue office, in my charge the half 'real,' cost of this stamp.

"Bexar, Nov. 23, 1819. LUIS GALAU (Paraph).

"In the city of San Fernando de Bexar, on the twenty-third day of the month of November, in the year eighteen hundred and nineteen, we, the commissioners of the board organized for the sale of property confiscated from the rebels of this province, by the order of the governor of the same, Colonel Don Antonio Martinez, viz., Captain Don Manuel Cedran, Don Vicente Gortori, first regidor of the ayuntamiento of this capital, and the resident José Flores de Abrego, by

virtue of the order of the said governor, in consequence of the order received by said chief from the intendancy of San Luis Potosi, to proceed to the sale and adjudication of said confiscated property for the benefit of the royal treasury, do certify and do, so far as we can, bear evidence that after said property was offered in public auction, according to accustomed processes, the 'suerte' of Miguel Losoya was adjudicated in favor of Don Francisco Garcia in the sum of fifty-five dollars, being bounded on the north by the land of the widow of Vicente Amador, on the south by that of Cipriano Losoya, on the east by the wall of the mission of Balero, and on the west by the land of Don Francisco Collantes and Manuel Hirnines, which tract of land was delivered by said board to Captain Don Francisco Garcia in the specified sum of fifty-five dollars, which he paid in current money for the benefit of the royal treasury, in consideration whereof he shall possess it now and hereafter as its lawful lord and owner, remaining at liberty to sell it again, to donate or transfer it by inheritance to whomsoever it may be his will, so that no contradiction may be opposed as to the freedom in which he remains to make use of it; and for due authenticity, and in order that this evidence of sale may avail him as a title and muniment in the archives of the government, and that as many copies of the same may be delivered to the party interested as he may desire, we sign these presents in the city of Bexar on the day, month, and year above stated.

　　　　　　　　　　　　" MANUEL CEDRAN (Paraph).
　　　　　　　　　　　　" VICENTE GORTORI (Paraph).
" I approve this sale.　　　　" JOSÉ FLORES (Paraph).
　　" MARTINEZ (Paraph)."

Among the depositions offered in evidence on the part of the plaintiffs were those of Juan N. Seguin and José Flores. The former of these, Juan N. Seguin, testified that he had resided in San Antonio from the year of his birth, 1807, until the year 1842; that in 1833 he was mayor of the city of San Antonio and political chief *pro tempore* of the department of Texas; that in 1835 he was captain of a company of Mexican

volunteers, and took part in the battle of San Jacinto in defence of the independence of Texas, April 21, 1836; that in 1838 he was elected senator in the Congress of Texas, and in May, 1840, mayor of the city council of the city of San Antonio; and that in 1869 he was appointed county judge of Wilson County, Texas, but subsequently removed to Mexico. He also testified that he was personally acquainted with the lands in controversy, known as the Miguel Losoya suerte, and had been since the year 1818, when Francisco Garcia consulted his father as to its purchase, and was acquainted with it as the property of Garcia, who went into and maintained peaceable possession of it until the year 1834, when he died of cholera in the Bahia del Esperitu Santo, near Goliad. He says the possession of the land by Garcia was public and notorious, and that from 1824 to 1835 it was cultivated by Felipe Musquize, whose brother, Don Raymond Musquize, was the attorney in fact of Don Francisco Garcia. This testimony as to possession is corroborated by the witness Flores, who says he leased it himself in 1835 from Raymond Musquize which fact is also testified to by another witness, Louis Gomez.

It further appears from the record that the plaintiffs' demurrer to the answers of the defendants, pleading the alienage of the plaintiffs and the statutes of limitation as defences, being overruled, the plaintiffs took issue by a general denial of the allegations by a supplemental petition, which also alleged "that in the year 1833, and from said year and up to the institution of this suit by the plaintiffs, Pilar Garcia de Sabariego had been a *feme covert* and married woman, and during the whole of said period labored, and still labors, under the disability of being a *feme covert* and married woman; that her father, Francisco Garcia, died intestate at Goliad, Texas, in the year 1834, and her mother, Gertrudes Barrera de Garcia, died intestate at Matamoras, in Mexico, in the year 1843; that at the times of the death of her said father and mother, and from said times until the bringing of this suit, she labored, and still labors, under the disability of being a *feme covert* and married woman, and plaintiffs plead the said disability as excepting and saving the said Pilar from the operation of all

limitation laws and from all presumptions of grant, and any and all other presumptions and pleas in defendants' answers contained, which are not good as against a *feme covert* and married woman."

*Mr. W. Hallett Phillips* for plaintiffs in error. *Mr. John Hancock* and *Mr. S. R. Fisher* were with him on his brief.

*Mr. John Ireland* for defendants in error submitted on his brief.

Mr. Justice Matthews, after stating the case, delivered the opinion of the court.

The precise point ruled by the Circuit Court in rejecting the evidence offered by the plaintiffs was that the documents, including the deed to Garcia, notwithstanding their recitals, failed to establish even *prima facie* any transfer of Losoya's title, to effect which it was necessary to prove by other evidence a lawful confiscation of his estate. This ruling is assigned for error on the ground, contended for by counsel for the plaintiffs in error, that the documents referred to, according to the laws prevailing in the locality at the time of their execution, were sufficient, with the aid of presumptions supplied by that law, to establish in the first instance the truth of the facts recited and on the basis of which alone the proceedings could be lawful, including the principal fact of a lawful confiscation of the estate of Miguel Losoya.

The contention on the part of the plaintiffs in error is stated by counsel, furnishing an opinion to that effect from Señor Emilio Velasco, an eminent lawyer of the city of Mexico, as follows:

"The documents upon the confiscation and sale are, therefore, authentic documents, and in their whole contents are entitled to full faith and credit. Thus, when the governor of Texas affirms in them that, by order of the commanding general, the property was confiscated, the affirmation is entitled to full faith and credit. A direct proof by the introduction of a certified copy of the order of confiscation issued by the com-

manding general would undoubtedly have been proper; but if it is not in existence the facts are sufficient proof that it did in fact exist:

"I. The inventory made by Captain Don Francisco del Prado y Arce, October 27, 1814, states that the said property was confiscated by order of the commanding general, Brigadier Don Joaquin de Arredondo. From the tenor of that document it is to be deduced that the said Prado y Arce held the character of depositary (custodian) and administrator of the confiscated property, and, consequently, when stating in the inventory that the confiscation had been done by the order of the commanding general, he affirmed a fact connected with the exercise of public functions and on account of which he exercised these same functions.

"II. The governor of Texas forwarded to the intendant of San Luis Potosi the inventory established by Captain Prado y Arce, and in his communication he stated that the property had been sequestered from the insurgents who, in 1811, took part in the revolution in Texas. The governor of Texas proceeded in the confiscation business in the exercise of the functions intrusted to him by law. When forwarding the inventory to the intendant of San Luis Potosi he accepted its contents and assumed the responsibility thereof, consequently it results from the documents authenticated by the governor of Texas that, in consequence of having taken part in the insurrection which occurred in Texas in 1811, the property of Miguel Losoya was confiscated by the order of the commanding general, Brigadier Don Joaquin de Arredondo.

"III. The opinion of Don José Ruiz de Aguirre, the 'asesor' [of the] intendancy of San Luis Potosi, and the decree of the intendant, Don Manuel de Acevedo, in which he concurs in the opinion, are, as stated by the governor of Texas, in the beginning of his statement of September 19, 1817, founded on the fact that the confiscation of the property was effected by the order of the commanding general of the eastern provinces. As will subsequently appear, both the intendant and his 'asesor' were judges, and in these cases acted as judges; there is reason, therefore, for affirming that, by a judicial resolution

(judgment), it was declared that the property had been confiscated by the order of the commanding general, and that the report of the governor of Texas was considered a sufficient foundation for this declaration.

"IV. Finally, in the 'asesor's' opinion and in the decree of the intendant of San Luis Potosi, it was directed that a report of the decision of these functionaries should be made to the commanding general. It further appears that this decree was complied with, and there is no evidence whatever that the commanding general denied the correctness of the report made by the governor of Texas.

"These several reasons admit of no doubt that the confiscation was effected by order of the commanding general; and authorizes the affirmation that it was done by a judicial resolution by a competent authority. It was so declared; therefore this point cannot be questioned."

In support of this conclusion counsel cite also the declarations of this court in cases supposed to be similar, and reference is made to that of the *United States* v. *Arredondo*, 6 Pet. 691. That case related to the validity of a Spanish grant of title to lands in Florida as affected by the treaty between Spain and the United States of 1819, and the question was as to the effect of the documents in evidence to show a grant of its own public lands by the Spanish government, entitled to be recognized as valid under the treaty with this country. Speaking to that point, this court said (p. 727): "It is thus clearly evidenced by the acts, the words, and intentions of the legislature that, in considering these claims by the special tribunals, the authority of the officer making the grant or other evidence of claim to lands formed no item in the title it conferred; that the United States never made that a point in issue between them and the claimants to be even considered, much less adjudicated. They have submitted to the principle which prevails as to all public grants of land, or acts of public officers in issuing warrants, orders of survey, permission to cultivate or improve, as evidence of inceptive and nascent titles, which is, that the public acts of public officers, purporting to be exercised in an official capacity and by public authority, shall not

be presumed to be a usurped but a legitimate authority, previously given or subsequently ratified, which is equivalent. If it was not a legal presumption that public and responsible officers, claiming and exercising the right of disposing of the public domain, did it by the order and consent of the government, in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite, even in this country; especially in the States whose tenures to land depend on every description of inceptive, vague and inchoate equities rising in the grade of evidence by various intermediate acts to a full and legal confirmation by patent under the great seal. . . . . Without the recognition of this principle there would be no safety in title papers, and no security for the enjoyment of property under them. It is true that a grant made without authority is void under all governments, (9 Cranch, 99; 5 Wheat. 303,) but in all the question is on whom the law throws the burden of proof of its existence or non-existence. A grant is void unless the grantor has the power to make it; but it is not void because the grantee does not prove or produce it. The law supplies this proof by legal presumption arising from the full, legal, and complete execution of the official grant, under all the solemnities known or proved to exist, or to be required by the law of the country where it is made and the land is situated. . . . This or no other court can require proof that there exists in every government a power to dispose of its property; in the absence of any elsewhere, we are bound to presume and consider that it exists in the officers or tribunal who exercise it by making grants, and that it is fully evidenced by occupation, enjoyment, and transfer of property had and made under them, without disturbance by any superior power, and respected by all coördinate and inferior officers and tribunals throughout the State, colony, or province where it lies. A public grant, or one made in the name and assumed authority of the sovereign power of the country, has never been considered as a special verdict, capable of being aided by no inference of the existence of other facts than those expressly found or apparent by necessary implication; an objection to its admission in evidence on

a trial at law or a hearing in equity is in the nature of a demurrer to evidence on the ground of its not conducing to prove the matter in issue. If admitted, the court, jury, or chancellor must receive it as evidence both of the facts it recites and declares, leading to and the foundation of the grant, and all other facts legally inferable by either from what is so apparent on its face. . . . The validity and legality of an act done by a governor of a conquered province depends on the jurisdiction over the subject matter delegated to him by his instruction from the king and the local laws and usages of the colony, when they have been adopted as the rules for its government. If any jurisdiction is given, and not limited, all acts done in its exercise are legal and valid ; if there is a discretion conferred, its abuse is a matter between the governor and his government, &c. *King* v. *Picton, late Governor of Trinidad,* 30 St. Tr. 869–871. It is a universal principle that where power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter ; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done and the public, or any person denying its validity, are power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer; whether executive, (1 Cranch, 170, 171,) legislative, (4 Wheat. 423; 2 Pet. 412; 4 Pet. 563,) judicial, (11 Mass. 227; 11 S. & R. 429, adopted in 2 Pet. 167, 168,) or special, (20 Johns. 739, 740 ; 2 Dow P. C. 521,) unless an appeal is provided for or other revision by some appellate or supervisory tribunal is prescribed by law."

The same principles were applied in the case of *Strother* v. *Lucas,* 12 Pet. 410, and have been uniformly recognized by the Supreme Court of Texas in dealing with claims of title based on the official acts of the public authorities of the preceding governments of Mexico and Spain. *Jones* v. *Muisbach,* 26 Texas, 235.

But in all these cases the question was whether the documents, with the recitals therein, and the presumptions of law and fact arising thereon, shown to have been executed by officers of the government, within the apparent scope of their authority, were sufficient in the first instance to show that the title of the government assumed by them to exist passed by the conveyance which undertook to transfer it. In no case, however, have they been held sufficient, where the fact in issue was whether the government at that time had any title to convey, to establish the fact in dispute, as against parties claiming a preëxisting adverse and paramount title in themselves. All that can be reasonably or lawfully claimed as the effect of such documents of title, is that they pass such estate, and such estate only, as the government itself, in whose name and on whose behalf the official acts appear to have been done, had at the time, but not to conclude the fact that the estate conveyed was lawfully vested in the grantor at the time of the grant. This is the doctrine declared by this court in the case of *Herron* v. *Dater*, 120 U. S. 464. In that case it was sought to give effect to a recital in a patent from the State of Pennsylvania as against the party who at the date of the patent was shown to have a title good as against the State. It was said by the court (p. 478): "Clearly that recital was not evidence against the plaintiffs, for if the patent could not take effect against them without it, it could not give any effect to that recital. Their right had already vested prior to the existence of the patent, and the grant to them could not be affected by a subsequent grant to a stranger." So in the present case, the question is not whether the title which the King of Spain had to the lands in controversy passed by the documents in question to Garcia, but whether at that date the King of Spain had the title which they purport to convey.

· The law on this subject was stated by this court in its opinion delivered by Mr. Justice Story in *Carver* v. *Astor*, 4 Pet. 1, 83, as follows: "It is laid down generally that a recital of one deed in another binds the parties and those who claim under them. Technically speaking, it operates as an estoppel,

and binds parties and privies — privies in blood, privies in estate, and privies in law. But it does not bind mere strangers, or those who claim by title paramount the deed. In does not bind persons claiming by an adverse title, or persons claiming from the parties by title anterior to the date of the reciting deed. Such is the general rule. But there are cases in which such a recital may be used as evidence even against strangers. If, for instance, there be the recital of a lease in a deed of release, and in a suit against a stranger the title under the release comes in question, there the recital of the lease in such release is not *per se* evidence of the existence of the lease. But if the existence and loss of the lease be established by other evidence, there the recital is admissible as secondary proof, in the absence of more perfect evidence, to establish the contents of the lease; and if the transaction be an ancient one, and the possession has been long held under such release, and is not otherwise to be accounted for, there the recital will of itself, under such circumstances, materially fortify the presumption from lapse of time and length of possession of the original existence of the lease."

So in *United States* v. *Ross*, 92 U. S. 281, this court, speaking by Mr. Justice Strong on this point, said (p. 284): "Because property was captured by a military officer and sent forward by him, and because there is an unclaimed fund in the treasury derived from the sales of property of the same kind as that captured, because *omnia praesumuntur rite esse acta,* and officers are presumed to have done their duty, it is not the law that a court can conclude that the property was delivered by the military officer to a treasury agent, that it was sold by him, and that the proceeds were covered into the treasury. The presumption that public officers have done their duty, like the presumption of innocence, is undoubtedly a legal presumption, but it does not supply proof of a substantive fact. Best, in his Treatise on Evidence, § 300, says: 'The true principle intended to be asserted by the rule seems to be, that there is a general disposition in courts of justice to uphold judicial and other acts rather than to render them inoperative; and with this view, where there is general evidence of facts having

been legally and regularly done, to dispense with proof of circumstances, strictly speaking, essential to the validity of those acts, and by which they were probably accompanied in most instances, although in others the assumption may rest on grounds of public policy.' Nowhere is the presumption held to be a substitute for proof of an independent and material fact."

It is contended, however, by counsel for the plaintiffs in error that the validity and effect of the documents under consideration must be tried by the system of law in force in the locality at the time of the transactions, and that, by reference to the Spanish law in force at the time in Mexico, the documentary evidence offered was sufficient to establish *prima facie* the title of Garcia as legitimately derived through a confiscation and sale of the property of Miguel Losoya.

By that law, as it appears, among the cases of treason the following is enumerated : " The third is, if any one induce, by deed or advice, a country or people, owing obedience to their king, to rise against him, or not to obey him as well as they formerly did." (Ley 1, tit. 2, partida 7 ; Law 5, tit. 32 of the Ordenamiento de Alcula ; Recopilacion, Ley 1, tit. 8, 18 lib. 8.) " The punishment of death and confiscation of property is inflicted upon persons guilty of this crime." (L. 2, tit. 18, lib. 8, Rec., 1 White's New Recopilacion, 255.)

It is admitted that, by the provisions of the Spanish law in force at the time, confiscation of property as a punishment for the crime of treason could only be effected by regular judicial proceedings. The text cited on that point is Ley 4, tit. 7, lib. 12, of the Novisima Recopilacion, as follows : " It is not our will that such persons should forfeit their property and offices without having first been heard and found guilty, and let the laws of our kingdom be observed in such case, unless their treason or evil deed be notorious." The authority of the king to take cognizance of cases of confiscation as a punishment for treason was entrusted in the Spanish colonies to other functionaries designated for the territory of New Spain, which subsequently became the Mexican Republic, in the Real Ordenanza, or Royal Ordinance, for the establishment and

instruction of the army and provincial intendants of the kingdom of New Spain, December 4, 1786. It is to Article 82 of this Ordenanza that the 'asesor,' Josef Ruiz de Aguirre, refers as the ground for recommending the sale of the property in question in one of the documents offered in evidence.

The following summary of the provisions of the Ordenanza bearing on that point is taken from the opinion of Señor Emilio Velasco furnished by counsel for the plaintiffs in error, and to which reference has already been made:

"In Article 1 of the Ordenanza twelve intendancies were established, one of which was that of San Luis Potosi. In Article 7 it was provided that the alcalde mayor, or corregidor (chief alcalde or corregidor) of San Luis Potosi should be united with the intendancy established in its capital and province. For this reason, in the procedure of confiscation, the title of the intendant corregidor of San Luis Potosi is assumed. This government by intendants continued until the independence of Mexico. (Hall's Mex. Law, § 16.)

"The intendants were very high functionaries in the colony. The king reserved to himself their appointment (see end of Article 1). Their functions were various and of very different nature from each other. In Article 7 it was ordered that they should take charge of the Departments of Justice, of Police, of Finance, and War. Each of these departments embraced highly important business of various kinds, minutely mentioned in the Ordenanza.

"Article 10 provides that the civil and military governors, among them the governor of Texas, should subsist. These governors still retained cognizance of judicial and police matters, together with the military command of their respective territories and matters pertaining to the Departments of Finance and War. The same article, at its close, provided that the intendants should appoint as their sub-delegates the said governors within the territories of their respective commands.

"Article 77 also says, in order that the mandates of the intendants be complied with in relation to this matter (the Department of Finance) and to that of War, . . . they shall

appoint . . . sub-delegates only for matters of controversy connected with these two branches, it being understood that in the capitals and the districts of the . . . government the said sub-delegate shall be attributed to the governors themselves as is provided in Article 10.

"In the same Ordenanza, the matter of the Department of Finance is included, in Articles 75 to 249, and, among them, Article 82 is included. This article refers to confiscation which, therefore, belonged to the Department of Finance, in which the governor of Texas acted as sub-delegate of the intendant; and, on this account, it is to be observed, in the procedure of the confiscation of Losoya's property, that the governor applied to the intendant of San Luis Potosi for instructions, and acted according to the orders of the latter. As said before, the functions of the intendants were various. The whole administration of the Department of War was entrusted to them; that which referred to taxation and fiscal property also pertained to them; they were the superior authority in the Department of Police; and, finally, they were judicial authorities.

"In this latter capacity their functions were exceedingly comprehensive. The intendants were Chief Justices in their provinces, and were entrusted with the jurisdiction which formerly belonged to the corregidores and chief alcaldes (Art. 11). Article 21 specifies the laws to which, in the administration of justice, they ought to subject themselves. Articles 22 and 23 confer upon them the power of supervision and vigilance over the other justices of the province.

"Each intendant should have a 'Teniente Letrado' — a deputy versed in law. The powers of this 'Teniente Letrado,' as a judicial functionary, had a dual character (Art. 15). By himself, in civil and criminal cases, he exercised contentious jurisdiction; in this point of view he was independent of the intendant's court, and his sentences were appealed from before the audiencia (Art. 19). But, besides this, he was 'asesor' (adviser) of the intendant; in this capacity all the intendancy's business, whether administrative or judicial, wherein a legal question was involved, was referred to him for his opinion to

enable the intendant to act. In this point of view the 'asesor' was an integrant part and parcel of the intendancy's court. For this reason in the procedure relating to the confiscation of Miguel Losoya's property the intendant, Don Manuel de Acevedo, called for the opinion of the 'asesor,' Don José Ruiz de Aguirre."

Article 82 of the Ordenanza provides as follows:

" In cases of confiscation of property situated in their provinces (those under an intendant) and of which a viceroy, the commanding general of the frontiers, the audiencias, or other tribunals have cognizance, they (the intendants) ought not to intervene without a special permission or trust from them (the viceroy, the commanding general, the audiencia or other tribunal) while the said property is kept sequestered; but, if the same come to be confiscated by a sentence ordered to be executed, it shall be the special duty of the intendant to proceed to the alienation thereof, and the collection of the proceeds, and also to take cognizance of all claims and controversies subsequently arising upon the confiscated property."

It is argued from this and the other provisions of the Ordenanza that the commanding general of the frontiers had the right in the matter of confiscation to take cognizance and pronounce sentence, not only as acting in the exercise of his military command, but as in charge of civil administration as a tribunal of justice; it being his duty in this matter to follow the procedure established by law, and to exercise the powers which the king himself exercises in the metropolis. It therefore pertained to him to inquire whether or not the crime was notorious, in order that he might pronounce sentence of confiscation without an actual hearing of the accused. In the proceedings relating to the confiscation of Miguel Losoya's property it is stated that "the commanding general of the eastern provinces" confiscated this property. The intendant corregidor of San Luis Potosi, and his 'asesor,' recognized him as such. It is, therefore, inferred that the commanding general of the eastern provinces was a commanding general of the frontiers, in the sense of Article 82 of the Ordenanza, and consequently had power to take cognizance of matters of confiscation.

Article 78 of the Ordenanza is also referred to. It reads as follows:

"As to what pertains to the exercise of contentious jurisdiction in the proceedings and business of my revenue, the intendants shall take special and exclusive cognizance, with inhibition of all magistrates, tribunals, and audiences of that kingdom. . . . They shall also act in all causes in which any interest may accrue . . . to my royal exchequer, or which may pertain to any of the branches or rights thereof under administration or in lease, both in respect to collection and to all matters incident thereto."

From this it appears that, confiscation once declared, the property belonged to the fiscal, and, therefore, as property in which the royal exchequer held an interest, it remained subject to the exclusive jurisdiction of the intendants, both in ordering the sale and for taking cognizance of controversies raised concerning it. According to Article 77, the military governors were sub-delegates to the intendant, and subordinate to him in authority, and their powers, in reference to the two branches of administration included under the head of finance and war, extended only to the institution of proceedings by them until they were placed in a position for final adjudication, when their proceedings were required to be forwarded to the intendant of the province for his decision, in concurrence with his 'asesor.'

In the present case it is shown by the documents that the governor of Texas instituted the proceedings in the condition in which the confiscated property was in 1817. The purpose of this procedure was to effect the sale of the property as confiscated. Under Article 77 it pertained to him to institute it; but the sentence that had to be pronounced, as to whether or not it must be sold, whether or not there was a legal cause for sale, and whether or not the condition of the property was such as to require a sale, was a judgment which could only be pronounced by the intendant after having heard his 'asesor.' The intendant and his 'asesor,' therefore, in the determination of this point, were called upon to inquire whether the confiscation was legal, or, in other words, whether a competent

authority had ordered it. In the present case, as appears by the documents, the intendant and his 'asesor' assumed that the commanding general of the eastern provinces had made the confiscation; they considered as sufficient proof of that fact the statement contained in the proceedings instituted by the governor of Texas. It is thence inferred and argued that their decision in this case, directing the sale of the property, was the exercise of jurisdiction in a judicial capacity, wherein they were required to examine and settle the proofs of the existence of the fact of confiscation, and that, therefore, the order directing the sale adjudged the fact and the legality of the confiscation, without which that sale could not have been authorized. It is thus sought to give to the recitals contained in the documents the force of a judicial determination operating as conclusive evidence of the fact supposed to be contained in it.

It will be observed, however, that this reasoning in regard to the probative force of the documents in question does not rest upon any positive provision of the Spanish law then and there in force giving that effect to such recitals. The only positive provision on that subject to which we are referred is that contained in Ley 1, tit. 18, partida 3, which says: "Every writing executed by the hand of a notary public of the council, or sealed with the king's seal, or with that of any other person having authority to affix his seal, is an authentic act (*escritura*) which is of itself full proof. From the faith given to these writings the greatest good arises; for they are the evidence of what has taken place, and full proof of the contract they contain." 1 Moreau and Carleton's Partidas, 222, tit. 18, law 1.

We do not, however, understand this provision as giving to such instrument any greater effect as evidence than similar documents have in our own law. They are proof, in solemn form, as ordained by the law, which defines the mode of their execution and preservation, of the transaction which they record and consummate. They certainly cannot be regarded as conclusive proof as to all persons, whether parties or not, of every fact to which they refer, or the existence of which seems to be implied.

In the present case, the documents in question declare that the property of Miguel Losoya is in the hands of public officers charged with its custody, as having been confiscated with that of others described as rebels, and regular and appropriate steps are officially taken to procure its sale as such. To justify the lawfulness of these proceedings unquestionably requires us to assume a prior and legal procedure against Miguel Losoya, resulting in the confiscation of his property for the alleged offence in accordance with existing law; but the legality of the procedure resulting in the sale of his property on the basis of that assumption is the very thing in question to be proved, and we are at last still confronted with the inquiry whether the absence of proof of the principal fact, on which the legality of everything succeeding it depends, can be supplied by a mere presumption.

In considering this question further, it is to be remarked that the documents under consideration do not even expressly recite that any judicial proceeding whatever was had against Miguel Losoya charging him with treason, that he ever had notice of such an accusation, or an opportunity to appear and defend against it; or, in the alternative, that his offence was found to be notorious, so as to dispense with any other notice than that given by the actual seizure of his property as the proper subject of confiscation. Nor in fact is it expressly stated that there had been any official seizure of the property for purposes of confiscation in any judicial proceeding. All these are the matters the existence of which we are asked to infer from the simple fact, which these documents do attest, that the property of Miguel Losoya was sold to Garcia by order of the intendant of San Luis Potosi, as though it had been regularly proceeded against and adjudged to be confiscated. In the absence of any positive provision of the local law to the contrary, we are bound to determine this question upon those principles of right reason and abstract justice which are recognized in our own system of jurisprudence. The presumption to which we are asked to resort for an answer to the question is, however, not peculiar to any system of law. It is found in the law of all civilized States, and the phrases in

which the maxim is expressed are taken from the civil law, the basis of the jurisprudence of Spain as of all other European states, and imported into the common law of England as adopted by us. *Omnia præsumuntur rite esse acta* is its familiar form, but as said by Mr. Best (Principles of Evidence, §§ 353, 361): "The extent to which presumptions will be made in support of acts depends very much on whether they are favored or not by law, and also on the nature of the fact required to be presumed." It does not apply to give jurisdiction to magistrates or other inferior tribunals; nor to give jurisdiction in proceedings not according to the common course of justice.

We are asked to assume that Miguel Losoya was guilty of the offence of treason against the King of Spain, and that he was so adjudged in regular judicial proceedings, on the basis of which conviction his property was officially seized and confiscated; and this we are asked to do as a judicial tribunal, sitting in a case wherein we are called to apply and administer the laws of Mexico, our government being the successor of that republic, as the republic was the successor of the Spanish government, in order to justify the taking of Miguel Losoya's property and transferring it to another for the sole offence on his part of assisting to achieve the independence of his own country, whose justice is now invoked against him. If we had before us an actual and formal decree of a competent tribunal adjudging him guilty of the offence, and confiscating his property in punishment therefor, that of itself would not be sufficient to establish its own validity. We should still require record evidence of the existence of those facts which brought him and his property within the jurisdiction of the tribunal pronouncing such a decree. "Wherever one is assailed in his person or his property," said this court in *Windsor* v. *McVeigh*, 93 U. S. 274, 277, "there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of a court pronounced against a party, without hearing him or giving him an opportunity to be heard, is not a judicial determi-

nation of his rights, and is not entitled to respect in any other tribunal. . . . The jurisdiction acquired by the court by seizure of the *res* was not to condemn the property without further proceedings. The physical seizure did not of itself establish the allegations of the libel, and could not, therefore, authorize the immediate forfeiture of the property seized. A sentence rendered simply from the fact of seizure would not be a judicial determination of the question of forfeiture, but a mere arbitrary edict of the judicial officer." To the same effect is the case of *Alexander* v. *Fairfax*, 95 U. S. 774. The subject was very thoroughly examined by Mr. Justice Story in *Bradstreet* v. *Neptune Insurance Co.*, 3 Sumner, 600. In that case, the question discussed had relation to the effect to be given to the decree and sentence of a foreign court of admiralty and prize *in rem*. The learned justice said (p. 608): " I hold, therefore, that if it does not appear upon the face of the record of the proceedings *in rem* that some specific offence is charged, for which the forfeiture *in rem* is sought, and that due notice of the proceedings has been given, either person- ally, or by some public proclamation, or by some notification or monition, acting *in rem* or attaching to the thing, so that the parties in interest may appear and make defence, and in point of fact the sentence of condemnation has passed upon *ex parte* statements without their appearance, it is not a judi- cial sentence conclusive upon the rights of foreigners, or to be treated in the tribunals of foreign nations as importing verity in its statements or proofs." In another place he said : " It amounts to little more in common sense and common honesty than the sentence of the tribunal which first punishes and then hears the party — *castigatque auditque*."

This was said, it is true, of the effect to be given in our courts to the decree of a court in a foreign jurisdiction. But the rule is the same in regard to domestic judgments, the records of which, to be effective as evidence, must show upon their face a case within the apparent jurisdiction of the court. If the mere decree and sentence of a court standing by itself, without the record of those prior proceedings necessary in law to support the judgment, is not receivable in evidence as proof

of its own legality, *a fortiori* no effect can be given to the proceedings in this case, unless sustained by proof of the actual proceedings against Miguel Losoya and his property conducted according to law to a sentence of judicial confiscation. The mere recital of the fact in the documents of sale is not evidence of the fact.

The statement made by Captain Don Francisco del Prado y Arce in the inventory dated October 27, 1814, that the property described in the list was confiscated by order of the commanding general, Brigadier Joaquin de Arredondo, while, as contended, it may be regarded as an affirmation on his part of the fact connected with the exercise of his public functions, is nevertheless not a certificate of the fact which he was by law authorized to make as proof of its existence. So when the governor of Texas forwards that inventory to the intendant of San Luis Potosi, and in his communication states that the property had been sequestered from the insurgents, who, in 1811, took part in the revolution in Texas, it is a mere narration of a fact supposed to exist by him on the authority of others, and not by virtue of any lawful authority on his part to certify to its truth. Neither can the opinion of Don José Ruiz de Aguirre, the 'asesor' of the intendancy of San Luis Potosi, and the order of the intendant, Don Manuel de Acevedo, concurring in the opinion, be regarded as a judicial finding of the fact that the property had been confiscated by the order of the commanding general of the eastern provinces. It is not shown, and is not pretended, that these officers had any authority under the law to pass judicially upon the question of the fact or the regularity of proceedings for confiscating the property of offenders, which must have taken place within the jurisdiction of another and a superior authority; nor is anything to be inferred from the fact recited that a report of the decision of these functionaries should be forwarded to the commanding general. It does not appear as a fact that they were laid before him, or were approved by him, and if they had been, his approval could not be construed to extend beyond the formal regularity of their proceedings in the sale. Notwithstanding all these recitals, and the infer-

ences and implications that are sought to be drawn from them, it still remains that the alleged confiscation of the property of Miguel Losoya, if it ever took place, could have been lawfully effected only by means of a formal judicial proceeding, which must be primarily proved by the official record of the transaction or a duly certified copy thereof, and, secondarily, in case of its loss, by proof of its previous existence and of its contents. The certificates of other officers referring to it only incidentally and collaterally, although as the basis of their own official action, are not legal proof of the fact itself.

This principle is illustrated by the case of *Atwell* v. *Winterport*, 60 Maine, 250, where it was decided that a certificate, officially signed by the provost-marshal of the district, that the plaintiff "has this day been credited as a recruit in the navy to the" defendant town "by order of the A. A. Pro.-Mar.-Gen. of Maine," was not legal evidence of his enlistment. Appleton, C. J., said: "The fact of enlistment is a matter of record. It must be proved by a duly authenticated copy from the army records. A sworn copy is admissible, or a copy certified by the proper certifying officer. But the certificate offered is not and does not purport to be a copy of any recorded fact or of any record. It is the assertion of the person certify'ng that the fact therein stated is true. A mere certificate that a certain fact appears of record, without the production of an authenticated copy of the record, is not evidence of the existence of the fact."

There are certain departments of scientific knowledge where an entire series of facts or forms may always be inferred from the existence of any one, according to the maxim *ex pede Herclem*. The conclusion in such cases is deduced from the observed uniformity of physical nature, which by a necessity of our own minds we believe to be invariable. But this mode of reasoning has but a very limited application in the law of evidence as judicially applied to ascertain the facts and motives of human conduct. It is the foundation of the doctrine of presumptions to the extent to which they are admitted, the limits of which in its application to the circumstances of this case we have already considered. The principal fact in con-

troversy in this case is one of that nature, which the policy of the law requires to be proved by direct evidence of a formal character. The absence of that proof cannot be supplied by argument and inference · from casual and collateral circumstances.

It is further argued, however, that, admitting this to be the case so far as Miguel Losoya is concerned, and those claiming title under him, nevertheless the documents are sufficient evidence, in the first instance, against every one else, and that consequently the defendants in this action are not entitled to make the objection. In support of this contention it is said:

"Among the laws quoted by Escriche is Ley 50, tit. 5, partida 5, in the final part whereof it is said, that if a thing belonging to another person is sold to two persons at different times, he who took possession first has the better right to it, always reserving the right of the true owner; consequently, color of title, coupled with possession, gave to the vendee a real right against every one except the owner, and, therefore, it is not lawful for third parties to impugn the title, thus exercising the right reserved alone to the owner or his successors.

"If subsequently to taking possession the vendee loses possession before prescribing the thing, his right is superior to that of all persons except the owner. He may pursue his action against third parties in the capacity of owner, resting on the purchase and on subsequent possession, because third parties have no right to question the validity of the title. In such case judgment should be pronounced declaring ownership in favor of the vendee; but such judgment bears no prejudice to the true owner who had not litigated, and who, during the term of prescription, may either exercise his right *de dominio*, or in case the thing has returned to his power, oppose the exception *de dominio* against the person who would sue him for it."

This is also the rule of the common law as declared by this court in the case of *Christy* v. *Scott*, 14 How. 282, where it was applied to a case from Texas arising under a Mexican title. The court, speaking by Mr. Justice Curtis, (p. 292,) said: "According to the settled principles of the common

law, this is not a defence to the action. The plaintiff says he was seized in fee, and the defendant ejected him from the possession. The defendant, not denying this, answers that if the plaintiff had any paper title it was under a certain grant which was not valid. He shows no title whatever in himself. But a mere intruder cannot enter on a person actually seized and eject him, and then question his title or set up an outstanding title in another. The maxim that the plaintiff must recover on the strength of his own title, and not on the weakness of the defendant's, is applicable to all actions for the recovery of property. But if the plaintiff had actual prior possession of the land, this is strong enough to enable him to recover it from a mere trespasser who entered without any title. He may do so by a writ of entry, where that remedy is still practiced, (*Jackson* v. *Boston and Worcester Railroad*, 1 Cush. (Mass.) 575,) or by an ejectment, (*Allen* v. *Rivington*, 2 Saund. 111; *Doe* v. *Read*, 8 East, 356; *Doe* v. *Dyboll*, 1 Moo. & M. 346; *Jackson* v. *Hazen*, 2 Johns. (N. Y.) 438; *Whitney* v. *Wright*, 15 Wend. (N. Y.) 171,) or he may maintain trespass (*Catteris* v. *Cowper*, 4 Taunt. 548; *Graham* v. *Peat*, 1 East, 246). Nor is there anything in the form of the remedy in Texas which renders these principles inapplicable to this case."

This rule is founded upon the presumption that every possession peaceably acquired is lawful, and is sustained by the policy of protecting the public peace against violence and disorder. But, as it is intended to prevent and redress trespasses and wrongs, it is limited to cases where the defendants are trespassers and wrongdoers. It is, therefore, qualified in its application by the circumstances which constitute the origin of the adverse possession, and the character of the claim on which it is defended. It does not extend to cases where the defendant has acquired the possession peaceably and in good faith, under color of title. *Lessee of Fowler* v. *Whiteman*, 2 Ohio St. 270; *Drew* v. *Swift*, 46 N. Y. 204. And in the language of the Supreme Court of Texas in *Wilson* v. *Palmer*, 18 Texas, 592, 595, "The evidence must show a continuous possession, or at least that it was not abandoned, to entitle a

plaintiff to recover merely by virtue of such possession." That is to say, the defendant's possession is in the first instance presumed to be rightful. To overcome that presumption the plaintiff, showing no better right by a title regularly deduced, is bound to prove that, being himself in prior possession, he was deprived of it by a wrongful intrusion by the defendant, whose possession, therefore, originated in a trespass. This implies that the prior possession relied on by the plaintiff must have continued until it was lost through the wrongful act of the defendant in dispossessing him. If the plaintiff cannot show an actual possession, and a wrongful dispossession by the defendant, but claims a constructive possession, he must still show the facts amounting to such constructive possession. If the lands, when entered upon by the defendant, were apparently vacant and actually unoccupied, and the plaintiff merely proves an antecedent possession, at some prior time, he must go further and show that his actual possession was not abandoned; otherwise he cannot be said to have had even a constructive possession.

To the same effect are the cases of *Jackson* v. *Walker*, 7 Cowen, 637; *Jackson* v. *Denn*, 5 Cowen, 200. In *Smith* v. *Lorillard*, 10 Johns. 338, 356, Kent, Chief Justice, said: " A prior possession short of twenty years, under a claim or assertion of right, will prevail over a subsequent possession of less than twenty years when no other evidence of title appears on either side. There are many decisions of this court which look to this point. *Jackson* v. *Hazen*, 2 Johns. 22; *Jackson* v. *Myers*, 3 Johns. 388; *Jackson* v. *Harder*, 4 Johns. 202. It is, however, to be understood in the cases to which the rule of evidence applies, that the prior possession of the plaintiff had not been voluntarily relinquished without the *animus revertendi*, (as is frequently the case with possessions taken by *squatters*,) and that the subsequent possession of the defendants was acquired by mere entry, without any lawful right. That the first possession should in such cases be the better evidence of right seems to be the just and necessary inference of law. The ejectment is a possessory action, and possession is always presumption of right, and it stands good until other and

stronger evidence destroys that presumption. This presumption of right every possessor of land has in the first instance, and after a continued possession for twenty years under pretence or claim of right, the actual possession ripens into a right of possession which will toll an entry; but until the possession of the tenant has become so matured, it would seem to follow that if the plaintiff shows a prior possession, and upon which the defendant entered without its having been formally abandoned as *derelict*, the presumption which arose from the tenant's possession is transferred to the prior possession of the plaintiff, and the tenant, to recall that presumption, must show a still prior possession; and so the presumption may be removed from one side to the other, *toties quoties*, until one party or the other has shown a possession which cannot be overreached, or puts an end to the doctrine of presumptions founded on mere possession by showing a regular legal title or a right of possession."

In *Jackson* v. *Rightmyre*, 16 Johns. 313, Chancellor Kent, delivering the opinion of the Court of Errors, speaks of the rule expressed by himself in the case of *Smith* v. *Lorillard*, and says that its qualifications are " that no other evidence of title appeared on either side, and that the subsequent possession of the defendant was acquired by mere entry without any legal right."

It therefore appears that prior possession is sufficient to entitle a party to recover in an action of ejectment only against a mere intruder or wrongdoer, or a person subsequently entering without right. Another qualification of the rule is, that the action to regain the prior possession must be brought within a reasonable time after it has been lost. If there has been delay in bringing the suit, the *animus revertendi* must be shown and the delay satisfactorily accounted for, or the prior possessor will be deemed to have abandoned his claim to the possession. Thus in *Whitney* v. *Wright*, 15 Wendell, 171, it was held that where there was a prior possession of eleven years, and then an entry by the defendants claiming under a title adverse to such possessory title, the omission to bring a suit for thirteen years, with knowledge of the adverse entry

and continuance of possession under it, would authorize a jury to find an abandonment of claim by the prior possessor.

In *Jackson* v. *Denn*, 5 Cowen, 200, the defendant had entered on a vacant possession, without any claim or color of title, and it was held that the plaintiff was entitled to recover on the strength of his prior possession, but the reason why the premises had been left vacant was explained by proving that the plaintiff did not know that his tenant had left the property until he found the defendant in possession.

It follows that in cases where the proof on the part of the plaintiff does not show a possession continuous until actual dispossession by the defendant, or those under whom he claims, the burden of proof is upon the plaintiff to show that his prior possession had not been abandoned.

There is nothing in the record to show that the evidence offered and rejected was tendered as proof of a possessory title relied upon as the basis of recovery by the plaintiffs. There was certainly no distinct statement to that effect made to the court by counsel when the offer was made, and, for aught that appears, the sole ground of the offer may have been the supposition that in some way the facts testified to in the depositions might be used to supply that defect in the evidence of the existence of a confiscation decree, on which the court ruled that the documentary title was not complete. It is, nevertheless, true that the court did rule upon the offer made "that all the said evidence read, as well as that proposed to be offered, showed no title in the plaintiffs which would warrant a verdict and judgment in their favor." It may, therefore, with reason now be contended by the plaintiffs in error that this was, in effect, a direction to the jury to return a verdict for the defendants upon the whole case as contained in the documentary evidence admitted, coupled with the testimony offered and rejected, and that they are entitled to the benefit of their exception in any aspect of the case as thus made; and from this it is argued that, having shown color of title by the defective documents relating to the confiscation, and an entry into possession under them, they were entitled to prove a continuance of that possession so as to authorize a recovery upon the strength of that title alone.

Assuming this to be so, the question is presented upon the whole testimony as offered, taken in connection with the documents read, whether the plaintiffs had thereby presented such a case as, in the absence of all other testimony, would have justified a verdict in their favor. The evidence on the subject contained in the depositions did not tend to establish any possession of the premises in dispute later than the year 1835. At that time Garcia himself had died, his daughter had married in the year 1833, and from the year 1835 the mother and daughter, with the husband of the latter, had left Texas and gone into Mexico, where they have ever after remained. There is no evidence whatever that after the year 1835 they exercised any dominion or control over this property in San Antonio, or were in possession of it through tenants or agents. The proof, therefore, does not satisfy the rule as stated by the authorities cited, for, although it shows that the possession on the part of the plaintiffs had been originally acquired under color of title, it does not show that that possession had been continuous and had not been abandoned. On the contrary, so far as the proof extends, it leaves a period of time, from 1835 to 1843, when, it is alleged in the petition, that the defendants, or those under whom they claim title, entered into possession, entirely unaccounted for, and during which, so far as the plaintiffs are concerned, the possession appears to have been vacant and abandoned. It follows, therefore, that the court committed no error in rejecting the offered proof of a prior peaceable possession under color of title. The judgment is accordingly

*Affirmed.*