# BRADSHAW *v.* ASHLEY.

### EJECTMENT; TRESPASSER.

1. In an action of ejectment, a plaintiff who has been peaceably in possession of real estate, under a claim of title, for a period of time even less than twenty years, when the possession has never been voluntarily abandoned or relinquished, is entitled to prevail against a mere trespasser who subsequently enters, but who shows no lawful right or title, or claim of title, in himself.
2. And it will not avail the defendant, in such a case, to show that a third person, with whom he fails to connect himself, has a better title than the plaintiff.

No. 769. Submitted November 4, 1898. Decided April 13, 1899.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on the verdict of a jury, in an action of ejectment. *Affirmed.*

The COURT in its opinion stated the case as follows:

The suit here is an action of ejectment instituted in the Supreme Court of the District of Columbia by the appellee, Nehemiah B. Ashley, as plaintiff, against the appellant, Aaron Bradshaw, as defendant, to recover the possession of an undivided interest in certain lots of ground in Square 939, in the city of Washington. The origin of the controversy is due to an apparent anomaly in the enumeration of the original lots in the square, which it is proper here to state.

The city of Washington comprises about 1,274 so-called squares of land, according to its original plan, all of which are divided into lots; and with the exception of eight squares, which are of irregular shape and not rectangular at all, the enumeration of the lots in each and all the squares proceeds upon a uniform system. This system is to begin with Lot 1 at the southeast corner of the square, and to proceed thence

in consecutive numerical order, first to the west, thence to the north, thence to the east, and thence to the south to the place of beginning. This method of enumeration is coeval with the original division of lots and squares in the city of Washington between the original proprietors of the land and the United States. Records of the division, signed by the original proprietors and by the commissioners acting for the United States, were made upon separate sheets of paper, one for each square, which sheets of paper were designated as "Certificates of Division," and were bound together, and, with the exception of some few that have been lost, were preserved in the office of the commissioner of public buildings and grounds, where they are yet retained. Each sheet of paper, or certificate of division, purports, by an endorsement upon it, to have been recorded in a record book kept for the purpose, and designated in such endorsement as "Square Book No. —."

But there are in existence two sets of record books purporting to be the transcripts of the original certificates of division—one designated as a "Register of Squares," in three volumes, kept in the office of the commissioner of public buildings and grounds; and the other designated as "Records of Squares," in four volumes, which is kept in the office of the surveyor of the District of Columbia. There seems to have been no express provision of law for the custody of these records; and it is apparent from the record of the cause now before us, that there is considerable doubt which of these two sets is the true official record. The question, although in the development of this cause it has ceased to be of much importance for the determination of the controversy between the parties to this suit, is of general importance in consequence of the fact that there are discrepancies between the two sets, and discrepancies between each of them and the original certificates of division. These last, however, seem to correspond more nearly to the record in the surveyor's office than to that in the office of the commissioner of pub-

lic buildings and grounds, and thus to indicate that the transcript in the surveyor's office is the true record.

Square 939, involved in the present controversy, seems to stand alone in its failure to conform to the otherwise universal system of enumeration. Both the original certificates of division, and the two transcripts before mentioned as purporting to be records thereof, show, as they are at present found, a double system of enumeration of the lots in this square—one with the numbers marked in ink, beginning for Lot 1, not at the southeast, but at the southwest corner, and proceeding thence north, thence east, thence south, thence west to the place of beginning, which, as is apparent, is not in accordance with the system adopted for all the other squares; and the other with the numbers marked in pencil, beginning for Lot 1 at the southeast corner, and proceeding thence west, thence north, thence east, and thence south to the place of beginning, in conformity with the general system. It may be presumed that the enumeration in pencil marks was affixed after the enumeration in ink had been made; but there is nothing to show when or by whom it was done, further than that it is shown to have come down with the books themselves to the present custodians, and to have antedated their memory or the memory of any of the witnesses who have testified in regard to them.

It was sought, on the part of the defendant, to be shown that the exceptional enumeration in ink was not confined alone to Square 939, and that there were nine other squares that failed to conform to the general system. But the assumption in regard to one of these squares, No. 949, is shown to have been a misapprehension; and the other eight are all of them so irregular in form that they are not entitled to be regarded as exceptions to the rule. The fact remains, that Square 939, if the figuring in ink be regarded as the true enumeration, stands alone in that regard as the sole exception to the universal system.

There are twenty lots in Square 939. If the figures in

ink are the correct figures, the lots in controversy would properly be designated by the numbers 1, 2, 3 and 20, which numbers were assigned to the original proprietor, George Walker, in the division between him and the United States. But if the figures in pencil are the correct figures, the lots in controversy would be designated by the numbers 4, 5, 6 and 3; and only one of these numbers (3) was assigned to George Walker in the division, the other numbers, 4, 5 and 6, being assigned to the United States.

The claim of the plaintiff is to the lots designated as pencil Lots 4, 5, 6 and 3, which are the same respectively as ink-numbered Lots 1, 2, 3 and 20. If the pencil numbers are the true enumeration, it does not seem to be seriously, if at all, controverted that the plaintiff has a perfect legal title of record to three of the lots which he claims, 4, 5 and 6, as these lots in the division remained to the United States and were duly disposed of by the United States in 1851, to the persons under and through whom the plaintiff claims. But if the ink numbers are the true numbers, neither one of the parties to this cause has any record title whatever, so far as the record before us shows, to the property in controversy, which would then be Lots 1, 2 and 3 and 20. Pencil Lot 3, which is ink Lot 20, and which, by whatever designation known, went to George Walker in the division, is claimed by the plaintiff under a tax title emanating from the corporation of Washington in 1822.

The original declaration in this cause was filed by the plaintiff on October 13, 1891, and sought to recover only an undivided interest in Lot 1, otherwise known as Lot 4; and it alleged the defendant's unlawful entry as of the date of March 27, 1891. An amended declaration, referred to in the record as the first amended declaration, was filed on March 11, 1893, wherein the plaintiff claimed an undivided interest in Lots 20, 1, 2 and 3, otherwise known as Lots 3, 4, 5 and 6; and the defendant's unlawful entry was again alleged as made on March 27, 1891. A second amended

declaration was filed on October 26, 1896, which claimed the same interest in the same property as the first amended declaration, but alleged the defendant's unlawful entry in one count as being on March 27, 1889; in another count as being on November 28, 1890; and in two other counts claimed *mesne* profits severally from those several dates. There was no proof, however, of *mesne* profits; and the counts respecting them have practically passed out of the case; and the difference in the alleged times of entry by the defendant does not appear to be of any importance.

To each and all the counts of the second amended declaration the defendant pleaded the general issue, as he had already pleaded to the previous declarations; and the case went to trial before a jury on this second amended declaration and the pleas thereto.

The theory, upon which the plaintiff proceeded, and to the support of which his testimony was directed, seems to have been threefold: (1) That the pencil numbers affixed to the lots in Square 939 were the correct numbers, and that therefore there was in him a perfect legal title of record upon which he was entitled to recover; (2) That, if on the other hand the ink numbers were the correct numbers, there was an adverse possession of upwards of twenty years, which had become a good possessory title, enuring to the benefit of the plaintiff, and upon which he was entitled to recover; and (3) That, even if the plaintiff had neither a good record title nor a good possessory title, yet he, and those under whom he claimed, had been in such actual, continuous and peaceable possession for years as that he was entitled, on the strength of such peaceable possession, to recover against a mere trespasser without title, or pretense of right or title, such as he claimed the defendant in the suit to be.

In the testimony it appeared, as already stated, that the pencil marks in question were quite ancient; that they had been on all the records beyond the time to which the memory of any of the witnesses could go; that in or about the

year 1816 there had been a record made of squares in the city of Washington by one DeKraft, at or about that time the surveyor of the city, under authority from the corporation of Washington, which was printed for public use, and in which Square 939 was shown with an enumeration of the lots identical with the so-called pencil enumeration and conformable to the system applied to all the other squares; that in or about the year 1868, John Carroll Brent and others, then owning or claiming ownership of the square, and apparently aware of the confusion in regard to the enumeration and intending to rectify it, made a new subdivision of the square by adopting and recording the pencil enumeration, and made conveyances of lots therein in accordance with this enumeration; that, in the said year 1868, the said John Carroll Brent, then claiming to be the owner of pencil Lot 3, conveyed the same to one Morris Downs, from and through whom the plaintiff's title was regularly derived; that, in the year 1851, one William T. Baldwin or William Tyler Baldwin purchased from the United States Lots 4, 5, and 6, and other lots, and entered into possession of the pencil lots so numbered as those which he had purchased; and that the title of Baldwin in those lots had been derived to the plaintiff, to the extent of the interest claimed by the latter, by regular deeds of conveyance.

It appeared, further, that the brother of plaintiff, from whom the latter immediately derived his title, had purchased part of the property in controversy in the year 1872 and part in 1881; and that he exercised acts of ownership over the premises by collecting rent from the occupants of a small house thereon, by selling sods, and disposing of a right of pasturage of cows, as well as by paying the taxes on the property.

The defendant in his testimony did not seek to show any right, title, or estate in himself, or in any others under whom he held. His effort was mainly directed towards the

disproving of the plaintiff's case. His testimony tended to throw discredit on the pencil enumeration of the lots, and to controvert the continuity and sufficiency of the plaintiff's possession ; and it seems to have been admitted by him that he entered upon the property and took possession of it with some show of force and violence on or about March 27, 1889. But a large part of his testimony consisted of deeds and other documentary evidence having reference to the title supposed to be outstanding in George Walker or his heirs, and which were offered in evidence, not for the purpose of showing any right or title in the defendant, which it was not claimed that they could do, but merely to show that the defendant was not a trespasser, as alleged on the part of the plaintiff.

George Walker is presumed to have been an alien, and to have left the United States and returned to his native country, Scotland or England, not long after the division of his lands with the United States; and he seems never again to have concerned himself with his property in the city of Washington by the payment of taxes upon it or in any other way. When he died, does not appear. Neither does it appear that his heirs, or any persons claiming to be his heirs, concerned themselves in any manner with the property, until a short time before the entry of the defendant in this cause, when the general appreciation in the values of land in this city caused an almost equally general investigation into forgotten or long-neglected titles.

The defendant introduced in evidence seven several deeds purporting to have been executed by persons in the United Kingdom of Great Britain and Ireland, and who claimed therein to be heirs at law of George Walker. These deeds assumed to convey to John H. Walter, of the city of Washington, the lands in said city of which George Walker had died seized and possessed, including the lots in Square 939 which had been assigned to him in the division with the United States. The earliest of these deeds bore the date

of August 2, 1889, and was recorded on September 27, 1899, the same day on which the defendant made his entry on the land in controversy. But there was no proof further than the recitals in the deeds themselves that the grantors in these deeds were in fact heirs of George Walker.

There was also offered in evidence by the defendant the record of an equity suit thereafter instituted in the Supreme Court of the District of Columbia, wherein the same John H. Walter was complainant and certain persons alleged to be heirs of George Walker who had not executed any deeds of their interest in his estate, were made defendants, the purpose of which suit was to have partition of the estate whereof George Walker had died seized, including his lots in Square 939. Under a decree rendered in this suit there was a sale by trustees and conveyance to John H. Walter of Lots 1, 2, 3 and 20, in Square 939, with other property.

In the next place, there was introduced in evidence, on behalf of the defendant, three several deeds of conveyance of Lots 40, 41, 42, 48, 49, 50, 51, 52 and 53, in a subdivision of Square 939 purporting to have been made by John H. Walter—the first of these three deeds being by John H. Walter to Mary D. Bradshaw; the second by Mary E. Bradshaw and her husband, Aaron Bradshaw, to Lydia Hoagland; and the third by Lydia Hoagland to Leda M. Morse, who seems to have been a typewriter in the office of John H. Walter. Subsequent to these was another deed, which was offered in evidence, from Leda M. Morse to Aaron Bradshaw, presumably the appellant here, although that fact does not appear from the record, conveying Lots 48, 49, 50, 51, 52 and 53, in Walter's subdivision of lots in Square 939, which deed was recorded on October 30, 1893. There is nothing in the record of the cause before us to show the identity of any of the property described in any of these four last mentioned deeds with any part of the property in suit; and it is not quite apparent why there should have been such an array of deeds.

The defendant next introduced in evidence an unrecorded tripartite contract purporting to have been executed on January 31, 1889, by persons, some of them apparently identical with the grantors in the seven deeds before mentioned or with some of them, claiming therein to be the heirs of one James Walker, who is stated in the paper to have been a brother and one of the heirs at law of George Walker, as parties of the first part; J. Augustus Taylor and John H. Walter, of the city of Washington, as parties of the second part; and James Aitken, of Falkirk, Scotland, as party of the third part, who was also one of the parties of the first part, and who, by the contract, was constituted the agent of them all to deal thereafter with the parties of the second part. The substance of this contract was that the parties of the second part should, at their own cost and expense, and without any liability for cost or expense on the part of the parties of the first part, prosecute the claim of these latter to any lands in the city of Washington to which they were entitled as the heirs of the said James Walker, and should receive as compensation for their services 25 per centum of the net recoveries, after the reimbursement to themselves of the cost and expenses of prosecution.

This tripartite contract recited the execution of deeds of the property by the parties of the first part under the same date to John H. Walter, a date which is not consistent with the deeds previously offered in evidence, which are all subsequent to it; and it recited also the fact of the execution of a deed of trust by Walter to secure a note for $250,000 which was to be held merely as security for the performance by him of his part of the contract. But, instead of this one deed of trust of even date with the contract to secure a note for $250,000, the defendant then offered in evidence three several deeds of trust, all of them of different dates, differing as well between themselves as from the contract, and each one to secure the sum of $100,000.

There was then offered in evidence, on behalf of the

defendant, a deed of release from the trustees in these last mentioned three several deeds of trust to Mary E. Bradshaw, dated September 6, 1892, and recorded on September 12, 1892, whereby they purported to convey to her the lots numbered 40, 41, 42, 48, 49, 50, 51, 52 and 53, in Walter's subdivision of lots in Square 939.

This was the substance of the testimony on behalf of the defendant, so far as it seems to be material for the determination of the questions involved in this case.

The plaintiff thereupon, resting his case on the third branch of his theory, to wit, that he and those under whom he claimed had been in the peaceable enjoyment and possession of the premises for many years prior to the defendant's entry and down to that time, and that the defendant was a mere trespasser without right or title of any kind, requested the court to give to the jury the following instruction, which was the only instruction asked by him, and which, as it is the basis of the principal question of controversy before us, we quote in full:

"If the jury believe from the evidence that Morris Downs took possession in 1868 of the lot referred to in the testimony as pencil number 3, fronting on B street, under his purchase of Lot 3, from John Carroll Brent; that he held and occupied said lot as a place of residence for himself and his family exclusively, claiming it as his own, until his conveyance of the same to plaintiff and cograntees in 1881; that he paid rent therefor to the plaintiff and his cograntees until 1882; and that since said last mentioned date and until the defendant entered thereon, if the jury find from the evidence that he did so enter, the plaintiff and his cograntees continued to exercise acts of exclusive ownership over the said lot, to pay taxes thereon, and to claim title thereto, and that they had never abandoned the same nor their claims to be owners thereof; and if they further find from the evidence that Tyler Baldwin and those claiming under him were in actual, exclusive possession of the lots referred to in

the evidence as pencil numbers 4, 5 and 6, cultivating and paying taxes thereon and claiming them as their own from the time of his purchase of Lots 4, 5 and 6, and others, from the United States in 1851, until some time during the war, and that thereafter those claiming under him continued to claim exclusive title thereto, pay the taxes thereon, renting the same or parts thereof from time to time, sold sods therefrom, and gave their tenants permission to pasture cows thereon, and that the right of pasturage so given was actually exercised by said tenants down to about the time the defendant entered upon said lots, if the jury find from the evidence that he did so enter, and that the plaintiff and others claiming under the said Baldwin have never abandoned the said lots nor their claim to be the owners thereof; and if the jury further believe from the evidence that the defendant, Aaron Bradshaw, in or about the month of March, 1889, without the knowledge or consent of the plaintiff and others claiming under the said Downs and Baldwin, entered upon the lots known as pencil numbers 3, 4, 5 and 6, and inclosed them with a fence; that he was in possession of all of said lots on the 13th day of October, 1891, when the original declaration in this cause was filed, and that he continued in possession of all of said lots until March 11, 1893, when the first amended declaration was filed, and subsequently; and if the jury further believe from the evidence that Joseph R. Ashley, the grantee in the deed from Christopher Ingle and Mary Baldwin, died intestate in 1875, and that he left as his only heirs at law two sisters and three brothers, of whom the plaintiff is one, then their verdict should be in favor of the plaintiff for the undivided parts of the lots in controversy claimed by him in the declaration.''

This instruction was given by the court to the jury, with some explanation; and the instruction constituted the substance of the charge in the case.

The defendant requested eight instructions, all of which

were refused. Five of these amounted to a peremptory direction to the jury to return a verdict for the defendant; and the other three were scarcely different from them. One of the three was to the effect that the jury should be told as matter of law that the division of lots in Square 939, between George Walker and the United States, was in accordance with the ink numbers, and that therefore the verdict should be for the defendant. A second was to the effect that the jury should be told as matter of law that the sale of lots by the United States to Baldwin in 1851 was according to the ink numbers, and not according to the pencil numbers; and that, therefore, the verdict should be in favor of the defendant. And the third was that there was no evidence, proper to be considered by the jury, to show that either the original division between the United States and George Walker or the conveyance by the United States to Baldwin in 1851 had been in accordance with the pencil numbers, and that therefore the verdict should be for the defendant.

During the presentation of the case to the jury by the counsel for the plaintiff, repeated exceptions were taken to their remarks; and several of these exceptions are now made the basis of assignments of error.

In its charge to the jury, which, as already stated, contained but little more than the instructions requested on behalf of the plaintiff, the court stated that the mass of documentary evidence in the case had become of little importance further than as it served to enlighten the claim of ownership of the parties in possession, and that the jury should decide the issue between the parties upon the question of possession for a term of years. At the conclusion of it, the court told the jury that they might take with them to their room the first amended declaration, so that they might be able to fix in their minds the date of the alleged entry by the defendant, as there stated—March 11, 1893. Counsel for plaintiff requested that they should also be permitted to take with

them the second amended declaration, under which the trial was had. To this the counsel for the defendant objected, and reserved an exception to its allowance by the court.

The court then also told the jury what the form of their verdict should be in either event; and that, if they found for the plaintiff, they might also allow him one cent damages, besides the possession of the property. To this ruling likewise exception was taken.

When the jury came in with their verdict, a colloquy ensued between them and the court in regard to it. Although what occurred then has been made the subject of exception, and one of the assignments of error before us is founded on that exception, we must regard the matter as too trivial for further notice by us.

The verdict was entered in favor of the plaintiff for the possession of the property claimed by him and one cent damages; and thereupon there was judgment. From this judgment the defendant has appealed.

*Mr. John Ridout, Mr. Wm. John Miller,* and *Mr. Wm. F. Mattingly* for the appellant:

1. The plaintiff, without any record title whatever to these Lots 1, 2, 3 and 20; without any conveyance of them from anybody even ever in possession of them, and without any claim to title by adverse possession himself, claims the right to recover the fee simple title to the property in an action of ejectment. In all cases in which the plaintiff seeks to recover on proof of adverse possession for twenty years, or the defendant to defend on the same ground, when the possession has been held by different persons for the twenty years, it is a familiar rule that in order to tack the possessions together, there must be shown a privity of estate between them, either grantee, heir, or devisee. Tyler on Eject. 915; *Davis* v. *Furlow,* 27 Md. 536.

In those jurisdictions where recovery is permitted on proof alone of prior possession, short of twenty years, and the

14 Ct. App.—33

plaintiff seeks to avail himself of the prior possession of another under whom he claims, he must show a valid conveyance from such party. *Plume* v. *Seward*, 4 Cal. 95; *Caldwell* v. *Carter*, 89 Am. Dec. 131.

There is no evidence whatever that the Ashleys ever were in actual possession of these lots. Under these circumstances the court told the jury that constructive possession under claim but without evidence of title is sufficient to enable the plaintiff to recover, unless the defendant proves a clear legal title in himself. If this is the law, then it will create a radical change in legal principles heretofore supposed to control proceedings in ejectment. This instruction was granted by the court upon the authority of *Smith* v. *Lorillard*, 10 John. 337. The court in that case had charged the jury that the plaintiff had shown an actual and undisturbed possession for seven or eight years at least, which was sufficient to entitle him to recover, unless the defendant had shown an adverse possession of twenty years, or a subsisting title out of the lessors of the plaintiff. In the case at bar there was not only no actual possession by the plaintiff, but the legal title was shown by him to be outstanding in George Walker or his heirs. In some of the States a similar doctrine has been advanced. But such has never heretofore been considered the law in this District.

In this jurisdiction it has always been held that the plaintiff can only recover on the strength of his own title. He must prove that at the time of suit brought he had the legal title and right of possession. The possession held by the defendant is presumptive evidence of a right of possession, and he can not be deprived of his possession by any other than the rightful owner. McHenry on Eject. 115; *Smith* v. *McCann*, 24 How. 398, 403; *Medley* v. *Williams*, 7 G. & J. 61, 72; *Wilson* v. *Inloes*, 11 G. & J. 358; *Lannay* v. *Wilson*, 30 Md. 536, 545; *Winter* v. *White*, 70 Md. 305, 318; *Hammond* v. *Inloes*, 4 Md. 138, 173, 174; *Fenn* v. *Holme*, 21 How. 481; *Shierbun* v. *Cordova*, 24 How. 423; *Fussell* v. *Gregg*,

113 U. S. 550, 555; *Hogan* v. *Kurtz*, 94 U. S. 773. The doctrine of *Smith* v. *Lorillard* has been repudiated in Maryland. See *Mitchell* v. *Mitchell*, 1 Md. 44–52–3.

The exceptional cases which justify a recovery on proof of prior possession are all cases of actual, visible possession; and not where the entry of the defendant was upon vacant, unoccupied land. If the instruction granted by the court below is sustained, then all that the plaintiff need do in an action of ejectment is to show that at some previous time he was in the possession of the property or exercised some act of ownership over it, and he will be entitled to recover unless the defendant can show a legal title to the property, no matter how rightfully he had entered. In other words, it simply reverses the rule hitherto supposed to prevail, that the plaintiff can recover solely on the strength of his own title and not on the weakness of that of his adversary.

The rule applicable to cases of actual possession by the plaintiff and entry and ouster by the defendant as a tres-passer have no application, as no such question was left to the jury. The land was conceded to have been unoccupied and vacant for several years prior to defendant's entry, and the instruction was based solely upon plaintiff's quasi-possession, which was held as matter of law sufficient to entitle him to recover, whether the defendant entered as a tres-passer or wrongdoer or in good faith under a claim of right and title.

2. Plaintiff in his declarations claimed the fee simple and was not entitled to recover unless he proved that he owned the fee. By act of June 1, 1870 (R. S. D. C., Sec. 809), Congress abolished all fictions in pleadings in actions of ejectment and enacted that they "shall be commenced in the name of the real party in interest and against the party claiming to own or be possessed thereof." The court, in prescribing its rules of practice under this act (Rule 7), provided that "the declaration shall specifically set forth the nature and the extent of the estate claimed by the

plaintiff in the premises." Under the act of Congress and rule of court it was essential to plaintiff's right to recover for him to prove title in'fee, and not merely a right to the possession. In those States where the statutory provisions are similar to our rule of court, the decisions are to the effect that the plaintiff must prove the title he claims in his declaration. *Rawson* v. *Taylor,* 57 Me. 343; *Hamilton* v. *Wentworth,* 58 Me. 105; *Alman* v. *Bonnell,* 76 Ill. 537.

3. Plaintiff has shown legal title outstanding in George Walker, the original proprietor, and was therefore not entitled to recover. It is a familiar rule of law that the defendant in ejectment can always prevent a recovery by showing the outstanding legal title to be in a stranger. In this case the plaintiff has shown the legal title to be outstanding in George Walker or his heirs, and does not pretend to connect himself in any way with that title. Even under the New York rule permitting recovery on proof of prior possession, it was on an alleged presumption of title from proof of possession, but where the actual title was shown to be outstanding in a stranger, the plaintiff could not recover. *Gillett* v. *Stanley,* 1 Hill, 121, 128; *Bloom* v. *Burdick,* 1 Hill, 130, 138.

4. The legal logic of the New York and similar cases is, that proof of possession, in the absence of evidence of title, raises a presumption of title; and the plaintiff will be entitled to recover, unless the defendant shows a prior possession or legal title in himself. But in this jurisdiction there can be no presumption of title against the United States, and hence no proof of possession either for a short time or for more than twenty years will enable a plaintiff to recover unless title is shown out of the United States, in which the court takes judicial notice the title was vested. But when plaintiff, to meet this necessity of his case, shows title out of the United States he has shown the legal title to be in some-one else, and this title thus shown can only be overcome by proof of a grant or by twenty years' adverse possession. When a plaintiff has shown the legal title outstanding,

proof of actual possession, short of twenty years, not only raises no presumption of title, but simply shows that the plaintiff himself had no right of entry.

*Mr. A. S. Worthington* and *Mr. J. J. Darlington* for the appellee:

Prior peaceable possession, not abandoned in any way, is sufficient title on which to recover as against a mere trespasser, showing no title and no honest claim of title in himself. This proposition would seem to be conclusively established in this jurisdiction by the decision of the Supreme Court of the United States, and, indeed, to be one upon which the authorities are unanimous everywhere. *Look* v. *Norton,* 55 Maine, 103; *Austin* v. *Bailey,* 37 Vt. 219, 225; *Christy* v. *Scott,* 14 How. 292; *Burt* v. *Panjaud,* 99 U. S. 180; 18 L. R. A., note pp. 784, 785; Cooley on Torts, 326 and note 1. A defendant can not defend in ejectment upon a title upon which he could not recover if plaintiff. *Hickey's Lessee* v. *Stewart,* 3 How. 759. A deed offered by defendant in ejectment (an intruder), from alleged heirs of the record owner, is inadmissible without proof that they were the heirs, *i. e.,* that their parents were married. *Van Auken* v. *Monroe,* 38 Mich. 725. Prior possession under claim of title for any period is good against one who enters on vacant land, and shows no title. *Smith* v. *Lorillard,* 10 John. 337, 346, 349, 353, 354; *Sabariego* v. *Maverick,* 124 U. S. 296. Defendant's entry, by suddenly putting a house on the land at night, did not confer such possession as put the plaintiff on any proof of his title. *Van Auken* v. *Monroe, supra.*

Mr. Justice MORRIS delivered the opinion of the Court:

There are eleven assignments of error, which, in view of the criticism upon them and of greater facility in the disposal of them, we may set forth in full. The court below erred, it is said:

" 1. In admitting the several items of evidence referred to

in respect of said pencil numbers of said lots and in denying defendant's motion in respect of the same.

"2. In admitting in evidence said De Kraft plat book.

"3. In admitting in evidence the alleged subdivision of said square.

"4. In granting said instruction to the jury prayed by the plaintiff.

"5. In repeating said instruction in the charge to the jury.

"6. In not granting defendant's prayer No. 8, that upon the whole evidence the verdict of the jury should be for the defendant.

"7. In denying each of said instructions prayed by the defendant.

"8. In allowing the jury to take with them into the jury room the first amended declaration, as appears from the exception on page 155 of the printed record.

"9. In instructing the jury to include in their verdict, if for the plaintiff, one cent damages, as appears by the exception on page 155 of the printed record.

"10. In refusing to enter the verdict as first rendered by the foreman of the jury, without any addition or explanation, and in directing that the verdict be recorded as if it had originally been rendered by the foreman, in favor of the plaintiff for the interest claimed in the second amended declaration, and one cent damages, as appears by the exceptions on page 156 of the printed record.

"11. The judgment below should be reversed because of the unauthorized utterances by counsel in the presence of the jury during the trial of the cause, as appears from the exceptions on pages 137, 142, 143, 144, 145, 148, 150 and 151 of the printed record."

Certainly the criticism is just that some of these assignments of error are irrelevant, some are too indefinite to serve the purpose for which assignments of error are intended, and some are frivolous. In the last category are those numbered

eight, nine and ten.    In regard to the matters therein stated the law is now too well settled and too elementary to allow them to be made the subjects of consideration by an appellate tribunal.   Moreover, there is no foundation in the record for the eighth assignment; the objection of the defendant was to the allowance to the jury to take the second amended declaration—not the first.   There was no objection made to their taking the latter paper.

The first, second and third assignments are irrelevant. The subject matter of them has practically passed out of the case.   The jury were instructed not to give it any consideration.   Even if the testimony in regard to the enumeration of the lots and to pencil numbers and ink numbers was incompetent to prove title in the plaintiff, it was certainly competent in order to throw light upon the conditions under which the parties in interest took possession; and the jury were told that for this purpose alone they might consider it. Plainly there was no error in this.

The fifth assignment is no more than a repetition of the fourth.

The sixth and seventh assignments are founded upon the refusal of the trial court to give to the jury the eight instructions requested by the defendant, or any of them.    But so far as these instructions have reference to the question of the designation of the lots by pencil numbers or by ink numbers, what we have said about the first, second and third assignments of error will suffice to dispose of them.    Even if the premises of these instructions were granted, it would not necessarily follow that a verdict should then be directed for the defendant; and they are on that ground, if for no other, untenable and vicious.   So far as these instructions involve merely the negation of the proposition contained in the instruction given to the jury at the instance of the plaintiff, they may be considered in connection with the fourth assignment.

There are, therefore, only two assignments of error, the

fourth and the eleventh, that require any consideration by us; and of these the eleventh does not seem to demand very serious or grave consideration.

This eleventh assignment is founded upon exceptions taken on behalf of the defendant to the allowance by the court of certain remarks used by the counsel for the plaintiff in argument to the jury, or to the court in the presence of the jury. It is certainly in the interest of justice that the rights of the parties should not be unduly prejudiced in argument by intemperate or improper language on the part of opposing counsel; and the Supreme Court of the United States, in the case of *Waldron* v. *Waldron,* 156 U. S. 361, took occasion to condemn the use of such language so far as to reverse a judgment which might have been influenced thereby. But we fail to find any such intemperate or improper use of language in the present case. It does not seem to us that counsel here unduly exceeded the proper limit of argument in their comments.

After all, the principal question in the case and, as we apprehend, the only question, is that which is raised by the instruction given to the jury at the instance of the plaintiff, and which forms the subject of the appellant's fourth assignment of error. That question is, whether, in a suit of ejectment, a plaintiff, who has been peaceably in possession of property, under a claim of title, for a period of time even less than twenty years, when the possession has never been voluntarily abandoned or relinquished, is entitled to prevail against a mere trespasser who subsequently enters, but shows no lawful right or title, or claim of title, in himself. And that question, it seems to us, has been conclusively determined in the affirmative for this jurisdiction by the decision of the Supreme Court of the United States in the case of *Sabariego* v. *Maverick,* 124 U. S. 296.

That case came up from the State of Texas, and was an action of trespass to try title, the equivalent in that State of the action of ejectment. The plaintiff in the action there,

as here, relied in the first instance upon a supposed record title; but the proof was insufficient, and reliance was sought to be had on a previous peaceable possession as against a subsequent possession without right. In support of this position the Spanish-American law was cited, as well as our common law. From the former the court cited the following provision:

"If a thing belonging to another person is sold to two persons at different times, he who took possession first has the better right to it, always reserving the right of the true owner. Consequently, color of title, coupled with possession, gives to the vendee a real right against everyone except the owner; and therefore it is not lawful for third parties to impugn the title, thus exercising the right reserved alone to the owner or his successor."

Thereupon the Supreme Court proceeded further to say:

"This is also the rule of the common law as declared by this court in the case of *Christy* v. *Scott*, 14 How. 282, where it was applied to a case from Texas arising under a Mexican title. The court, speaking by Mr. Justice Curtis (p. 292), said: 'According to the settled principles of the common law, this is not a defense to the action. The plaintiff says that he was seized in fee, and that the defendant ejected him from the possession. The defendant, not denying this, answers that, if the plaintiff had any paper title, it was under a certain grant which was not valid. He shows no title whatever in himself. But a mere intruder can not enter upon a person actually seized and eject him, and then question his title or set up an outstanding title in another. The maxim that the plaintiff must recover on the strength of his own title, and not on the weakness of the defendant's, is applicable to all actions for the recovery of property. But if the plaintiff had actual prior possession of the land, this is strong enough to enable him to recover it from a mere trespasser who entered without any title. He may do so by a writ of entry, where that remedy is still practiced,

(*Jackson* v. *Boston and Worcester R.R.*, 1 Cush. (Mass.), 575); or
by an ejectment (*Allen* v. *Rivington*, 2 Saund. 111 ; *Doe* v.
*Read*, 8 East, 356 ; *Doe* v. *Dyboll*, 1 Moo. & M. 346; *Jackson*
v. *Hazen*, 2 Johns. (N. Y.), 438; *Whitney* v. *Wright*, 15 Wend.
(N. Y.), 171); or he may maintain trespass (*Catteris* v. *Cow-
per*, 4 Taunton, 548; *Graham* v. *Peat*, 1 East, 246). Nor is there
anything in the form of the remedy in Texas which renders
these principles inapplicable to this case.'

"This rule is founded upon the presumption that every
possession peaceably acquired is lawful, and is sustained by
the policy of protecting the public peace against violence
and disorder. But as it is intended to prevent and redress
trespasses and wrongs, it is limited to cases where the de-
fendants are trespassers and wrongdoers. It is, therefore,
qualified in its application by the circumstances which con-
stitute the origin of the adverse possession, and the charac-
ter of the claim on which it is defended. It does not
extend to cases where the defendant has acquired the pos-
session peaceably, and in good faith, under color of title.
*Lessee of Fowler* v. *Whiteman*, 2 Ohio St. 270 ; *Drew* v. *Swift*,
46 N. Y. 204. And in the language of the Supreme Court
of Texas in *Wilson* v. *Palmer*, 18 Texas, 592, 595 : ' The
evidence must show a continuous possession, or at least that
it was not abandoned, to entitle a plaintiff to recover merely
by virtue of such possession.' That is to say the defend-
ant's possession is in the first instance presumed to be
rightful. To overcome that presumption the plaintiff, show-
ing no better right by a title regularly deduced, is bound to
prove that, being himself in prior possession, he was de-
prived of it by a wrongful intrusion by the defendant, whose
possession, therefore, originated in a trespass. This implies
that the prior possession relied on by the plaintiff must
have continued until it was lost by the wrongful act of the
defendant in dispossessing him. If the plaintiff can not show
an actual possession, and a wrongful dispossession by the
defendant, but claims a constructive possession, he must

still show the facts amounting to such constructive possession. If the lands, when entered upon by the defendant, were apparently vacant and actually unoccupied, and the plaintiff merely proves an antecedent possession at some prior time, he must go farther and show that his actual possession was not abandoned; otherwise he can not be said to have had even a constructive possession.

"To the same effect are the cases of *Jackson* v. *Walker*, 7 Cowen, 637; *Jackson* v. *Denn*, 5 Cowen, 200. In *Smith* v. *Lorillard*, 10 Johns. 338, 356, Kent, Chief Justice, said: 'A prior possession short of twenty years, under a claim or assertion of right, will prevail over a subsequent possession of less than twenty years, when no other evidence of title appears on either side. There are many decisions of this court which look to this point. *Jackson* v. *Hazen*, 2 Johns. 22; *Jackson* v. *Myers*, 3 Johns. 388; *Jackson* v. *Harder*, 4 Johns. 202. It is, however, to be understood in the cases to which this rule of evidence applies, that the prior possession of the plaintiff had not been voluntarily relinquished without the *animus revertendi* (as is frequently the case with possessions taken by squatters), and that the subsequent possession of the defendants was acquired by mere entry, without any lawful right. That the first possession should in such cases be the better evidence of right seems to be the just and necessary inference of law. The ejectment is a possessory action, and possession is always presumption of right; and it stands good until other and stronger evidence destroys that presumption. This presumption of right every possessor of land has in the first instance; and after a continued possession for twenty years under pretense or claim of right, the actual possession ripens into a right of possession which will toll an entry. But until the possession of the tenant has become so matured, it would seem to follow that, if the plaintiff shows a prior possession, and upon which the defendant entered without its having been formally abandoned as derelict, the presumption which arose

from the tenant's possession is transferred to the prior possession of the plaintiff, and the tenant, to recall that presumption, must show a still prior possession; and so the presumption may be removed from one side to the other, *toties quoties,* until one party or the other has shown a possession which can not be overreached, or puts an end to the doctrine of presumptions founded on mere possession by showing a regular legal title or a right of possession.'

"In *Jackson* v. *Rightmyre,* 16 Johns. 313, Chancellor Kent, delivering the opinion of the Court of Errors, speaks of the rule expressed by himself in the case of *Smith* v. *Lorillard,* and says that its qualifications are 'that no other evidence of title appears on either side, and that the subsequent possession of the defendant was acquired by mere entry without any legal right.'

"It therefore appears that prior possession is sufficient to entitle a party to recover in an action of ejectment only against a mere intruder or wrongdoer, or a person subsequently entering without right. Another qualification of the rule is, that the action to regain the prior possession must be brought within a reasonable time after it has been lost. If there has been delay in bringing this suit, the *animus revertendi* must be shown and the delay satisfactorily accounted for, or the prior possessor will be deemed to have abandoned his claim to the possession. Thus in *Whitney* v. *Wright,* 15 Wendell, 171, it was held that where there was a prior possession of eleven years, and then an entry by the defendants claiming under a title adverse to such possessory title, the omission to bring a suit for thirteen years, with knowledge of the adverse entry and continuance of possession under it, would authorize a jury to find an abandonment of claim by the prior possessor.

"In *Jackson* v. *Denn,* 5 Cowen, 200, the defendant had entered on a vacant possession, without any claim or color of title, and it was held that the plaintiff was entitled to recover on the strength of his prior possession; but the reason

why the premises had been left vacant was explained by proving that the plaintiff did not know that his tenant had left the property until he found the defendant in possession.

"It follows that in cases where the proof on the part of the plaintiff does not show a possession continuous until actual dispossession by the defendant, or those under whom he claims, the burden of proof is upon the plaintiff to show that his prior possession has not been abandoned."

In view of this full and exhaustive, and for us authoritative, exposition of the law upon the precise question now before us, it would seem to be unnecessary, as well as useless, to seek elsewhere either for authority or for argument. It is of no consequence that there are decisions to be found in other jurisdictions which apply an inconsistent or contrary doctrine. The Supreme Court of the United States, in adopting the rule laid down by Chancellor Kent in the case of *Smith* v. *Lorillard,* has settled the question for this jurisdiction; and we have only to apply the rule.

It is very true that in the State of Maryland a very different doctrine has been adopted, and consistently adhered to, and the rule of the case of *Smith* v. *Lorillard* has been repudiated. *Mitchell* v. *Mitchell,* 1 Md. 44. And it is likewise true that the doctrine of the courts of Maryland, as expounded in the case just cited, has generally been understood to be the law of this District in reference to actions of ejectment. But whatever may have been the understanding, it must now be regarded as settled law for us, settled by the decision of the Supreme Court of the United States in the case of *Sabariego* v. *Maverick,* that the doctrine announced by Chancellor Kent in the case of *Smith* v. *Lorillard* must prevail with reference to the class of cases covered by it. That class is specific, and the rule, as we have seen, has its distinct qualifications and limitations; but it is certainly equitable and just that the peaceable occupant and possessor of property should not be put upon proof of his title by every casual intruder who trespasses upon his land. The

effect of the rule is not to change the law that governs the action of ejectment, but, in the interests of peace and justice, to require the intruder, or would-be intruder, to have recourse to the action of ejectment, if he has any good right or title to the land, instead of permitting him to install himself upon the land by a tortious occupation. It does not shift the burden of proof, as argued on behalf of the appellant; but it places the duty of instituting the action of ejectment where it should be placed.

Nor does the rule contravene the general principle, that the plaintiff in the action of ejectment must prevail, if at all, by the strength of his own case, and not by the weakness of that of the defendant. On the contrary, that principle is expressly acknowledged and reiterated by the court in the case of *Sabariego* v. *Maverick,* where it is stated to be no more than the general rule applicable to all cases, which requires that a plaintiff should always show at least *prima facie* right in himself, and that it is not sufficient for him to show that the defendant has no right. The *prima facie* right in cases like the present is shown by the proof of peaceable possession under a claim of ownership for a reasonable time and of the unauthorized and tortious entry by the defendant.

Under the rule as laid down by the Supreme Court of the United States, there was sufficient testimony in this case to go to the jury to show peaceable possession of the premises in controversy by the plaintiff and those under whom he claimed under color of title and claim of ownership for many years before the entry of the defendant; there was proof of such repeated acts of ownership as to go to the jury to show the continuity of the possession, and that it had never been voluntarily relinquished or abandoned; and there was proof tending to show that the defendant was a mere trespasser who entered without right of any kind. If the defendant had in himself, or there was in those under whom he claimed, the title of George Walker supposed to be outstanding, and that title was good as to the property in controversy, it ought

not to have been impossible to show it, and that title would have defeated the plaintiff's right under his prior peaceable possession and his title presumed thereunder. But the papers offered in evidence by him with reference to this Walker title proved nothing. The first of those papers in the order of time was a contract so palpably champertous that it could be allowed no validity whatever for any purpose. The recitals in the deeds were not in this case proof of the heirship which they alleged; and the deeds themselves, as they appear in the record before us, fail to connect the defendant in any manner with the premises in controversy. All this documentary evidence, therefore, was wholly irrelevant, and was ineffectual for the sole purpose for which we understand it to have been offered, that of showing that the defendant was not a mere trespasser without claim or right or title. It does not make one less a trespasser that someone else with whom he fails to connect himself may have a better title than the plaintiff. The evident inference from the doctrine maintained by the Supreme Court of the United States, and the proper inference for the peace and good order of society, is that peaceable possession under claim of title, not in any way abandoned, especially when it has extended over many years, is not to be terminated by the mere entry of some other person upon the land; and that, if such other person deems that he has good title to the land, he, and not the prior peaceful occupant, should be put to his action of ejectment.

We find no error in the action of the Supreme Court of the District of Columbia in this case. And it necessarily follows from what has been said that the judgment of that court in the premises should be *affirmed, with costs. And it is so ordered.*